

**SIGNED this 14th day of June, 2012.**

_____
**CRAIG A. GARGOTTA**
**UNITED STATES BANKRUPTCY JUDGE**

_____

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | | |
|---|---|---|
| IN RE: | § | CASE NO. 10-13235-CAG |
| | § | |
| **MANGIA PIZZA INVESTMENTS, LP,** | § | CHAPTER 11 |
| Debtor. | § | |

### MEMORANDUM OPINION ON CONFIRMATION OF COMPETING PLANS

Came on to be considered the competing plans filed in this case between the Debtor and

Cloud Cap Restaurants, LLC ("Cloud Cap").  For the reasons stated herein, the Court will deny

confirmation of both plans.

The Court finds that it has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and

1334.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(c) (confirmation of

plans).  Venue is proper under 28 U.S.C. § 1408(1). This matter is referred to this Court by the

District's Standing Order of Reference. The following constitutes the Court's findings of fact and

conclusions of law pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure.

## BACKGROUND

Mangia Pizza is a locally owned pizza restaurant. Prior to filing bankruptcy, it had several locations in Austin; but as the economy worsened, Mangia scaled back its operations to one location in Austin, Texas, and licensed its name to operations at Austin-Bergstrom International Airport and Georgetown, Texas.

Mangia Pizza filed Chapter 11 bankruptcy on November 10, 2010. The Chapter 11 case continued with little dispute until the disclosure statement hearing in July 2011. At the Debtor's disclosure statement hearing, the Court learned that Cloud Cap had purchased the claim of Knife Sharpest for $244.66 and, because exclusivity had terminated, filed a competing disclosure statement. Cloud Cap's disclosure statement adopted much of the information contained in the Debtor's disclosure statement; but Cloud Cap provided more disclosure regarding the pizza industry nationally and locally. Further, Cloud Cap articulated its business plan for the Debtor, which included a revised menu, improved décor for the restaurant, and a proposed expansion of the restaurant. Cloud Cap also objected to the Debtor's lack of disclosure, focusing on feasibility and an apparent inability to confirm a plan.

The Court reset consideration of approving both disclosure statements to allow the parties to come to an agreement regarding the adequacy of disclosure under 11 U.S.C. § 1125. The parties did agree on a form of disclosure statement for both sides. The Court approved the amended disclosure statement for both Cloud Cap and the Debtor. The parties further agreed that one plan packet would be sent to all creditors that included copies of both amended disclosure statements and plans. Creditors were given the option of voting for either plan, voting for both plans, or rejecting both plans. If claimants voted to accept both plans, they were to indicate which plan they preferred. The parties further agreed that the Court would consider confirmation of both plans, allowing the Debtor to present its plan first and Cloud Cap second.

2

Although discussed in more detail herein, the plans are similar in terms of classification and treatment but for one significant aspect: Cloud Cap has created a fund of $305,000 with which Cloud Cap proposes to pay administrative, secured, priority claims in full (with some exceptions) and provide a 22% dividend to allowed unsecured non-priority claims shortly after confirmation of its plan. The Debtor proposes to pay all creditors in full over time from ongoing operations. Depending on how well or poorly Debtor's operations generate revenue, it could take until 2022 for all creditors to be paid under the Debtor's amended plan.

Both plans were set for confirmation on August 24, 2011. Cloud Cap and the Debtor filed a number of pleadings with the Court seeking a Court ruling that the parties suggested would be dispositive of issues regarding confirmation of the competing plans. Those motions are: "Motion of Cloud Cap Restaurants, LLC for Approval of Non-Material Modifications to Cloud Cap's Second Amended Plan of Reorganization" (docket no. 118), and the Debtor's Response (docket no. 121); "Motion for Order Disallowing Claims and Designating Votes Filed By Jeff Sayers [Claim Nos. 25, 26, and 27]" (docket no 122); and the Debtor's "Expedited Motion to Temporarily Allow Claims of Jeff Sayers [Claim Nos. 25, 26 and 27]" (docket no. 123).

The Court continued the hearing on confirmation of both plans from August 24, 2011 to September 12, 2011 to make oral rulings on these Motions. The Court will incorporate its prior rulings into this Memorandum Opinion for the purpose of memorializing those rulings.

As part of the hearing on Cloud Cap's Motion for Approval of Non-Material Modifications, Cloud Cap requested that the Court find as a matter of law that the IRS's secured claim could be considered an impaired accepting class under Section 1129(a)(10). Cloud Cap needed an impaired accepting class under Section 1129(a)(10) to obtain confirmation of its Plan because it did not have an accepting impaired class.

<u>11 U.S.C. § 1129(a)(9)(C) and (D) (2006)</u>

(a)    The court shall confirm a plan only if all of the following requirements are met:

(9) Except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the plan provides that--

(C)    with respect to a claim of a kind specified in section 507(a)(8) of this title, the holder of such claim will receive on account of such claim regular installment payments in cash—

(i) of a total value, as of the effective date of the plan, equal to the allowed amount of such claim;

(ii) over a period ending not later than 5 years after the date of the order for relief under section 301, 302, or 303; and

(iii) in a manner not less favorable than the most favored nonpriority unsecured claim provided for by the plan (other than cash payments made to a class of creditors under section 1122(b)); and

(D) with respect to a secured claim which would otherwise meet the description of an unsecured claim of a governmental unit under section 507(a)(8), but for the secured status of that claim, the holder of that claim will receive on account of that claim, cash payments, in the same manner and over the same period, as prescribed in subparagraph (C).

<u>11 U.S.C. § 1129(a)(10) (2006)</u>

(a)    The court shall confirm a plan only if all of the following requirements are met:

(10)  If a class of claims is impaired under the plan, at least one class of claims that is impaired under the plan has accepted the plan, determined without including any acceptance of the plan by any insider.

### CONTENTION OF THE PLAN PROPONENTS AS TO THE IRS AS AN IMPAIRED ACCEPTING CLASS

<u>Cloud Cap's Argument</u>

Cloud Cap argues that the IRS is an impaired accepting class for purposes of voting and cram down.  Cloud Cap's argument rests on the determination that a secured tax lien may constitute a class and that, by agreeing to treatment worse than that provided by § 1129(a)(9)(D),

the claim is impaired. Cloud Cap cites *In re Greenwood Point, LP*, 445 B.R. 885, 906–07 (Bankr. S.D. Ind. 2011), for the proposition that because § 1123(a)(1) does not prohibit the classification of secured tax claims, such claims may constitute an impaired accepting class.

<u>The Debtor's Argument</u>

The Debtor argues that the secured tax lien in this case cannot be impaired. The Debtor cites a portion of *Greenwood Point*, noting that "because the Code sets forth . . . minimally acceptable statutory treatment for unsecured priority tax claims for confirmation, several courts have found that such claims cannot be impaired." 445 B.R. at 906. In addition, the Debtor cites *Pennbank v. Winters*, 99 B.R. 658 (Bankr. W.D. Pa. 1989), cited in *Greenwood Point*, stating that "if the priority tax creditors agree to a treatment other than what they are entitled to, they are not impaired."

The Debtor also argues that the secured tax claim is not eligible for classification. For this proposition, the Debtor relies on the distinction between a creditor being offered treatment worse than that required by § 1129(a)(9)(D), and agreeing to such treatment. In relying on this distinction, the Debtor cites *In re EQK Bridgeview Plaza, Inc.*, No. 10-37054-SGJ-11, 2011 WL 2458068, at *2 n.1 (Bankr. N.D. Tex. June 16, 2011), where the court states that a secured tax claim might be treated as an impaired accepting class if "the secured tax claimant were offered treatment worse than Section 1129(a)(9)." The Debtor claims that because the IRS has agreed to such treatment, it has not been "offered" treatment worse than § 1129(a)(9)(c).

**ANALYSIS**

The treatment of the IRS's secured tax claim as impaired is consistent with both *Greenwood Point* and *In re Perdido Motel Group, Inc.*, 101 B.R. 289 (Bankr. N.D. Ala. 1989). In *Perdido Motel*, the court determined that when a creditor's rights are altered by the plan, even if pursuant to § 1129(a), the creditor's rights are impaired. 101 B.R. at 293.

5

In addition, as noted in *Greenwood Point*, the Code states that a class of claims is impaired unless "the plan leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest." ***In re Greenwood Point***, 445 B.R. at 906; 11 U.S.C. § 1124(1) (2006). In *Greenwood Point*, the court also observed that the Seventh Circuit has determined that "the standard for impairment is very lenient and 'any alteration of the rights constitutes impairment even if the value of the rights is enhanced.'" *Id.* (quoting ***In re Wabash Valley Power Assoc., Inc.***, 72 F.3d 1305, 1321 (7th Cir. 1995)). Because the plan in this case alters the IRS's statutory right to receive payments over a term of five years from the date of the order for relief, its rights are impaired under the language of § 1124(1).

It is unsettled whether a secured tax claim may constitute a class capable of voting on a plan of reorganization. Some commentators have noted that class is "a 'word of art,' the purpose of which is to state the 'treatment' in a plan where otherwise not set by statute." Guy B. Moss & Christopher M. Candon, ***SARE debtors: Solving the Impaired Voting Class Dilemma through Municipalities?*** 30-6 Am. Bankr. Inst. J. 20, 78, (2011). The Journal notes that while the court in *Greenwood Point* permitted the classification of a secured tax claim, the classification argument may be persuasive in another forum, especially because a secured tax claim "must receive the same treatment in a plan as a § 507(a)(8) unsecured tax claim" under the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005. *Id.*

In *Perdido Motel*, the court, having found unsecured IRS tax claims to be impaired, nonetheless determined that the claims were not a "class" within the meaning of § 1129(a)(10). The court examined the requirement of § 1123(a) that a plan shall "designate . . . classes of claims, other than claims of a kind specified in . . . § 507(a)(8) of this title." 11 U.S.C. § 1123(a)(1). Because the tax claims at issue in *Perdido Motel* were unsecured, they fell under

the provisions of § 507(a)(8), and were specifically excluded from treatment as a "class" under § 1123(a)(1).

The tax claims in *Greenwood Point* were secured claims, and thus not specifically excluded from classification by § 1123(a)(1). Because § 507(a)(8) deals only with unsecured claims, the court in *Greenwood Point* determined that the secured tax claims in that case could constitute a class within the meaning of § 1129(a)(10). ***In re Greenwood Point, LP***, 445 B.R. at 906–07.

The ruling in *Greenwood Point* that secured tax claims may be treated as a "class" for purposes of voting and cram down is not universal. While the Court in *Greenwood Point* looked at the specific statutory language to determine that a secured tax claim may be treated as a "class" because it is not specifically prohibited from such treatment by § 1123(a)(1), there is a better argument in this Court's judgment that such a result would frustrate the statute's purpose to exclude claims that receive favorable statutory treatment from voting for purposes of cram down.

In *Perdido Motel*, the court held that one of the primary reasons for denying class status to unsecured tax claims is that priority tax claims are entitled to preferential treatment under § 1129(a)(9)(C). ***In re Perdido Motel Group, Inc.***, 101 B.R. at 293–94. It is important to note that while secured tax claims are not addressed by § 507(a)(8), they are entitled to preferential treatment under § 1129(a)(9)(C) through § 1129(a)(9)(D), which requires that secured tax claims be given the same treatment as unsecured claims. The Fourth Circuit has determined that "priority tax claimants, which receive preferential treatment under the Code (see 11 U.S.C. § 1129(a)(9)(C)), are not an impaired class that can accept a plan and bind other truly impaired creditors to a cram down." ***In re Bryson Properties, XVIII***, 961 F.2d 496, 501 n.8 (4th Cir. 1992). Because § 1129(a)(9)(D) requires that secured tax claims be given the same treatment as

all other priority tax claims, there is a strong argument to be made that such claims should be treated equally when it comes to purposes of voting and cram down.

The Court recognizes that there are several instances where courts have allowed classes of secured tax claims to vote.  *See, e.g.*, **In re Sunflower Racing, Inc.**, 219 B.R. 587, 597 (Bankr. D. Kan. 1998), *aff'd*, 226 B.R. 673 (D. Kan. 1998) (noting that class consisting of secured claim of a county treasurer is impaired and has voted to accept a plan); **In re Gramercy Twins Assocs.**, 187 B.R. 112, 115 (Bankr. S.D.N.Y. 1995) (noting that a class consisting of a city tax lien was impaired and entitled to vote); **In re Ropt Ltd. P'ship**, 152 B.R. 406, 411 (Bankr. D. Mass. 1993) (declaring that a town was entitled to vote because the plan altered the town's legal rights with regard to its fully-secured tax lien).

While it is unsettled whether a secured tax claim may be classified for purposes of voting and cram down, the better reasoning suggests that a secured tax claim should not be treated as a "class."  The Court agrees that given the express statutory treatment afforded tax claims, tax claims should not be given the ability to vote if the taxing authority accepts treatment less than that allowed under section 1129(a)(9)(C) and (D).  In doing so, creditors who are not given statutory rights will not have their votes diluted.

The parties also asked the Court to consider, prior to the confirmation hearing, pleadings affecting Jeff Sayers' proof of claim and vote.  Cloud Cap objected to Jeff Sayers' proof of claim prior to confirmation.  As a result, the Debtor moved to have Sayers' claim temporarily allowed, so that Sayers' negative vote as to Cloud Cap's Plan could be counted.  Should Sayers' claims be temporarily allowed, then as an initial matter the unsecured class under Cloud Cap's Plan would not have enough votes in an amount to be an impaired accepting class.

**SHOULD JEFF SAYERS' CLAIM BE ALLOWED TO VOTE?**

<u>11 U.S.C. § 502(a) (2006)</u>

(a)     A claim or interest, proof of which is filed under section 501 of this title, is deemed allowed, unless a party in interest, including a creditor of a general partner in a partnership that is a debtor in a case under chapter 7 of this title, objects.

<u>Fed. R. Bankr. P. 3018(a)</u>

(a)     Entities entitled to accept or reject plan; time for acceptance or rejection.

A plan may be accepted or rejected in accordance with § 1126 of the Code within the time fixed by the court pursuant to Rule 3017.  Subject to subdivision (b) of this rule, an equity security holder or creditor whose claim is based on a security of record shall not be entitled to accept or reject a plan unless the equity security holder or creditor is the holder of record of the security on the date the order approving the disclosure statement is entered or on another date fixed by the court, for cause, after notice and a hearing.  For cause shown, the court after notice and hearing may permit a creditor or equity security holder to change or withdraw an acceptance or rejection.  Notwithstanding objection to a claim or interest, the court after notice and hearing may temporarily allow the claim or interest in an amount which the court deems proper for the purpose of accepting or rejecting a plan.

Rule 3018(a) allows a bankruptcy judge to "temporarily allow [an objected to] claim or interest in an amount which the court deems proper for the purpose of accepting or rejecting a plan."  Fed. R. Bankr. P. 3018(a).  According to the Tenth Circuit, "[t]he policy behind temporarily allowing claims is to prevent possible abuse by plan proponents who might ensure acceptance of a plan by filing last minute objections to the claims of dissenting creditors."  ***In re Armstrong***, 294 B.R. 344, 354 (B.A.P. 10th Cir. 2003), *aff'd*, 97 F. App'x. 285 (10th Cir. 2004).

The court has broad authority to determine whether to allow or disallow a claim for purposes of voting.  The Bankruptcy Appellate Panel of the Tenth Circuit has determined that "[t]here is no guidance in the Bankruptcy Code to courts as to how to determine whether to permit the temporary allowance of a claim; it is left to a court's discretion."  ***In re Armstrong***,

294 B.R. at 354. Various courts have developed factors to consider when determining whether to temporarily allow a claim for purposes of voting on a proposed plan.

One factor that has been considered in determining whether to temporarily allow a claim is the expectations of the parties regarding treatment of the claim as evidenced in their proposed plans. *In re Stone Hedge Props.*, 191 B.R. 59 (Bankr. M.D. Pa. 1995). In *Stone Hedge*, a creditor sought to reclassify as unsecured a portion of its secured claim based on a subsequent valuation of the underlying asset. *Id.* at 62. The court considered three factors in deciding whether to temporarily allow the creditor's claim: "(1) the manner in which the claim was initially scheduled by the Debtor; (2) the proof of claim filed by the creditor; and (3) the objection (adversary counterclaim) of the Debtor." *Id.* at 65. Because the debtor's original schedules had listed the debt as fully secured, and both the debtor's and creditor's plans had indicated that the debt was secured, the court chose to temporarily allow the claim for voting purposes only to the lesser of the value of the collateral or the debt. *Id.* at 66. By limiting the claim to the value of the collateral or the debt, the court sought to ensure that the claim was valued consistently with how each party had characterized it in their original plans and schedules. *Id.* at 66.

Other courts have developed various multi-factor tests for determining whether to temporarily allow a claim for purposes of voting. *See, e.g.*, *In re Harmony Holdings, LLC*, 395 B.R. 350, 354 (Bankr. D.S.C. 2008). The court in *Harmony Holdings* found persuasive the factors considered in *In re Gardinier, Inc.*, 55 B.R. 601 (Bankr. M.D. Fla. 1985), namely "(1) whether the objection to the claim at issue appears to be frivolous or without basis, (2) the effective power which the holder of the disputed claim may have to scuttle the reorganization proceeding, which is almost near completion, and (3) given the facts of that case, that the debtor

was willing to preserve funds to pay the disputed claim under the terms of the plan in the event the claim was ultimately allowed." *In re Harmony Holdings, LLC*, 395 B.R. at 354.

In *Gardinier*, the court found that the objected to claim represented roughly 20% of the claims in its class, which may have provided the creditor with "enough leverage to exert pressure on other creditors in this class and persuade them to reject the Plan" and "scuttle" the reorganization proceeding. *In re Gardinier, Inc.*, 55 B.R. at 604-05. In deciding against temporarily allowing the claim, the court additionally noted that the debtor was willing to preserve funds to pay the creditor "in the event their claim is ultimately allowed with finality." *Id.*at 605.

Similarly, in *Armstrong* the court found that "A creditor may request the temporary allowance of a claim under one of the following nonexclusive circumstances: when an objection to the claim has been filed and 'the objection was filed too late to be heard prior to the confirmation hearing, when fully hearing the objection would delay administration of the case, or when the objection is frivolous or of questionable merit.'" *In re Armstrong*, 294 B.R. at 354 (quoting 9 Collier on Bankruptcy ¶ 3018.01[5] (Lawrence P. King ed., 15th ed. 2003)).

While several courts have developed various multi-factor tests to apply when determining whether to temporarily allow a claim for purposes of voting, the choice is ultimately one of the court's discretion. The most persistent factors considered by the courts are: (1) whether the objection was filed late or "at the last minute," either to ensure acceptance of a plan or to avoid a proper hearing; (2) whether the allowance or non-allowance of the claim will delay administration of the case; and (3) whether the objection was frivolous. *Id.* In addition, at least one court has considered the mutual expectations of the parties, as evidenced in their proposed plans, when considering whether to temporarily allow a claim for purposes of voting. *In re Stone Hedge Props.*, 191 B.R. at 66.

Cloud Cap primarily objected to Sayers' claim as cast in bad faith because by voting no, Sayers could dominate the unsecured class and prevent the unsecured class from being an accepting class. While there may be some issues regarding Sayers' proof of claims being adequately documented, the timing of Cloud Cap's objection to Sayers' proof of claims is problematic. A late filed objection to claim would prevent Sayers from voting. Moreover, there is no evidence that Sayers did not have some claims. As such, the Court temporarily allowed the Sayers' claims as filed. That said, the Court must now address whether Sayers' vote was cast in bad faith.

### WAS SAYERS' VOTE CAST IN BAD FAITH?

<u>11 U.S.C. § 1126(e) (2006)</u>

(e) On request of a party in interest, and after notice and a hearing, the court may designate any entity whose acceptance or rejection of such plan was not in good faith, or was not solicited or procured in good faith or in accordance with the provisions of this title.

Under 11 U.S.C. § 1126(e), "the court may designate any entity whose acceptance or rejection of [a] plan was not in good faith." "The consequence of such designation is that the vote is disregarded in the counting of votes to determine whether a class has accepted or rejected the Plan . . . ." *In re Save Our Springs Alliance, Inc. ("SOS")*, 388 B.R. 202, 230 (Bankr. W.D. Tex. 2008). Whether a vote is cast in good faith depends on the facts of the particular case. *Id.* Generally, courts have determined that when a vote is cast for an ulterior motive that is only incidentally related to the creditor's status as a creditor, the vote should be designated as cast in bad faith. *See e.g.*, *id.* at 230 ("A creditor may not cast his vote for an ulterior purpose and expect to have it counted . . . .") (quoting *Insinger Mach. Co. v. Fed. Support Co.*, 859 F.2d 17, 19) (4th Cir. 1988); *In re Landing Assoc., Ltd.*, 157 B.R. 791, 807 (Bankr. W.D. Tex. 1993) ("[W]hen the voting process is being used as a device with which to accomplish some ulterior purpose, out of keeping with the purpose of the reorganization process itself, and only

incidentally related to the creditor's status *qua* creditor, section 1126(e) is rightly invoked."); ***In re Holly Knoll P'ship***, 167 B.R. 381, 385 (Bankr. E.D. Pa. 1994) ("Courts have generally held that if a purchaser of claims in voting the assigned claims is pursuing an interest in addition to its interest as a creditor, bad faith may be found.").

Not every ulterior motive will be sufficient for designating a vote as being cast in bad faith. *See **In re Landing Assoc., Ltd.***, 157 B.R. at 807 (noting that "in many cases, creditors act for a variety of motives, only some of which are directly related to their status as creditors," and that a vote by a trade creditor for the purpose of ensuring the survival of an entity with which to do business would not be the sort of ulterior motive that should lead to a bad faith designation). When a creditor's vote is motivated primarily for the accomplishment of receiving some benefit only tangentially related to the creditor's status as a creditor, however, the vote should be disregarded as having been cast in bad faith. *See id.* at 803 ("[I]f the creditor fails to convince the court that the questioned activity was motivated by business judgment, then the court must inquire into the creditor's motives. . . . Under this approach, then, it is essential to examine the nature of the true interest being benefitted by the questioned activity."); *See also* 7 Collier on Bankruptcy ¶ 1126.06[1] (Lawrence P. King ed., 15th ed. 2003) ("The inquiry in deciding whether a creditor acted in good faith is whether its vote was cast for the ulterior purpose of securing some advantage to which the creditor would not otherwise have been entitled.  The mere pursuit of economic gain does not, of itself, indicate bad faith on the part of a creditor, as long as the interest being served is that of creditor as creditor, as opposed to creditor in some other capacity.").

One of the ways in which courts have sought to ascertain the motives of a creditor in casting its vote has been to look to the way in which the claim was acquired.  The court in ***In re Allegheny Int'l, Inc.***, 118 B.R. 282 (Bankr. W.D. Pa. 1990), noted that the creditor in that case

had purchased its claims only after the debtor's disclosure statement was approved, and then "almost exactly in the amount required to block the plan of reorganization." *Id.* at 289–90. In addition, in determining that the creditor's true motive was to "take over and control the debtor," the court noted that the two classes in which the creditor had purchased claims had "directly opposite interests with respect to the . . . litigation." *Id.*

Similarly, when an insider acquires claims for the purpose of blocking a competing plan, it may be evidence of bad faith. *In re Applegate Prop., Ltd*., 133 B.R. 827 (Bankr. W.D. Tex. 1991). In *Applegate*, a related entity of the debtor corporation acquired claims shortly before the consideration of competing plans in order to block confirmation of the competing plan. *Id.* at 830, 834. Based on this fact, the court determined that the true interest being benefited was the debtor's interest in avoiding liquidation, rather than the related entity's interest as a creditor. *Id.* at 834–35. While the acquisition of claims for the purpose of blocking a competing plan is not an act of bad faith in itself, it can be strong evidence of bad faith, especially when the claims are acquired by an insider. *Compare id.* at 835 ("One may reasonably infer . . . that Congress had in mind the considerations of independent third parties when it directed courts to accede to the desires of creditors in Section 1129(c), rather than the wishes of an insider."), *with In re United Marine, Inc.*, 197 B.R. 942 (Bankr. S.D. Fla. 1996) (noting that insiders held "valid pre-petition claim[s]" in finding no bad faith on the part of the insiders).

In the instant case, Sayers' claims arose pre-petition. The Court may still look, however, to the manner in which claims were acquired to determine if Sayers' vote may have been cast in bad faith. Cloud Cap argues that Sayers' claims arise from "years and years of undercapitalization and mismanagement." (Cloud Cap's Motion for Order Disallowing Claims and Designating Votes Filed by Jeff Sayers, docket no. 122, at 8, Aug. 23, 2004. Unlike the cases cited above, where claims were acquired for the purposes of affecting the outcome of a

vote on the plan, Sayers' claims, arising over "years and years," likely were not acquired in bad faith. In fact, the claims facially show loans to the Debtor and forgiveness of debt.

Still, even if Sayers' claims were not acquired in bad faith, his votes may have been cast in bad faith if they were cast primarily for some ulterior motive only incidentally related to his status as a creditor. One such motive might be financial gain in some other capacity upon confirmation of the plan. *See **In re Landing**,* 157 B.R. at 803 (describing ***Town of Belleair, Fla. v. Groves***, 132 F.2d 542 (5th Cir. 1942) (where creditors who were also bondholders of the debtor were induced to vote for a plan by "special benefits," which benefited their interests as bondholders rather than as creditors)); *see also **In re Holly Knoll P'ship***, 167 B.R. 381, 388–89 (Bankr. E.D. Pa. 1994) (noting that a creditor who voted for the plan would become general partner of the debtor in the event of the plan's confirmation, and would receive substantial fees from the reorganized debtor in that capacity, in designating that creditor's vote as being cast in bad faith).

According to Cloud Cap, Sayers stands to "own 100% of the equity in the Reorganized Debtor [and] maintain 100% control of the Reorganized Debtor," if the Debtor's plan is confirmed. (Cloud Cap's Objection to Debtor's Plan of Reorganization, docket no. 112, at 3, Aug. 17, 2011.) Like the creditor in *Holly Knoll*, Sayers stands to gain control and perhaps financial benefits as the sole equity holder in the reorganized company. The court in *Holly Knoll* was convinced that this was the primary motivation for the creditor's vote in favor of the plan. ***In re Holly Knoll P'ship***, 167 B.R. at 388–89. The court found this fact based on the circumstances surrounding the vote, including the purchase of a claim only after learning that the plan could not be confirmed otherwise. *Id.*

As noted above, the circumstances surrounding the vote in this case do not tend to indicate that Sayers attempted to manipulate the vote by purchasing claims to ensure passage of a

specific plan. Rather, Cloud Cap alleges that Sayers' claims arise from "years and years of undercapitalization and mismanagement." (Cloud Cap's Motion, docket no. 122, at 8.) Sayers has much to gain as an equity holder, in terms of corporate control, in the event that the Debtor's plan is confirmed. It would not be unreasonable to determine that such interests may be the primary motive for Sayers' vote against Cloud Cap's plan, though without any additional evidence, to do so might be unwarranted. Sayers has another reason for voting against Cloud Cap's Plan. David Turpin testified on behalf of Cloud Cap that Cloud Cap may not pay all of the IRS's proof of claim. In doing so, should Cloud Cap not pay the trust fund portion of the IRS's claim, then Sayers' responsible officer liability for trust fund taxes would be enforceable against him. As such, Sayers has additional tax exposure should Cloud Cap's Plan be approved.

The Second Circuit has declared that "bankruptcy courts should employ § 1126(e) designation sparingly." *In re DBSD N. Am., Inc.*, 634 F.3d 79, 101 (2d Cir. 2011). "A party seeking to designate another's vote bears the burden of proving that it was not cast in good faith." *Id.* at 102; *see also In re United Marine, Inc.*, 197 B.R. at 947 ("The burden is on the objecting creditor to sustain its claim under § 1126(e) that acceptance or rejection of the plan was not in good faith. . . ."). Furthermore, "if a creditor sufficiently manifests a proper motive for the questioned activity, courts have been unwilling to second-guess the wisdom of the creditor's exercise of business judgment." *In re Landing Assoc.*, 157 B.R. at 803. In choosing not to second-guess a creditor's business judgment, the courts have recognized that creditors often have "mixed motives" when choosing a plan, and that in most circumstances such other motives are legitimate business interests that should not serve as a basis for a bad-faith designation. *Id.* at 807–08.

Cloud Cap has merely pointed to Sayers' expected post-confirmation position without indicating any behavior on his part indicative of bad faith. In *In re DBSD N. Am., Inc.*, the

Second Circuit noted the presence of significant evidence of an ulterior motive in that case, including the creditor's admissions in court, its position as a competitor of the debtor, its willingness to overpay for the claims it bought, its attempt to propose its own plan, and its internal communications which showed a desire "to obtain a blocking position" and "control the bankruptcy process."  In re DBSD N. Am., Inc. 634 F.3d at 104-05.  None of these factors are present here.  For these reasons, Sayers' vote should not be designated under 11 U.S.C. § 1126(e) without some showing by Cloud Cap that Sayers' is, in fact, acting in pursuit of some ulterior motive unrelated to his status as a creditor.  None was proven at trial.

### SUMMARY OF COMPETING PLANS AND DIFFERENCES

<u>Debtor's First Amended Combined Disclosure Statement and Chapter 11 Plan of Reorganization dated July 28, 2011 (Docket No. 97)</u>

The Debtor's Plan provides for full payment of administrative claims, priority claims, secured claims, and general unsecured claims.  (Debtor's Plan ¶ 1.2, docket no. 97.)  Unsecured claims will be paid over time with initial payments to the general unsecured claims of $1,333.30 per month for the first sixty (60) months of the Plan and then increasing to $6,057.30 per month in month 61 of the Plan.  The interest rate on payment of unsecured general claims is at the federal judgment rate of 0.18%.  The final payment to unsecured creditors is in July 2022, but if Debtor's financial projections are accurate, unsecured general claims could be paid as soon as June 2017.

The Debtor's Plan includes 11 classes of claims.  Some of those classes do not contain any filed claims.  (Debtor's Plan ¶ 7.2).  Those remaining classes of claims are described as follows:

**Administrative Claims**

Administrative Claims:  Except to the extent that any entity entitled to payment of any Allowed Administrative Claim agrees to a different treatment, each holder of an Allowed Administrative Claim shall receive Cash from funds available from the operations of the Debtor

in an amount equal to such Allowed Administrative Claim on the later of the Effective Date or the date such Administrative Claim becomes an Allowed Administrative Claim, or as soon thereafter as practicable.

Any Claims of Professionals approved by the Court shall be paid in Cash in such amounts as are Allowed by Final Order of the Court (a) within five (5) days following the date such Claim of a Professional becomes an Administrative Claim; or (b) upon such other terms as may be mutually agreed upon between such holder of a Claim and the Reorganized Debtor.

Brown McCarroll, L.L.P.'s Professional Claim:  Brown McCarroll, L.L.P. has agreed to be paid pursuant to terms that will be disclosed in the Plan Supplement to be filed on or before August 10, 2011.

**Class 2: Allowed Priority Non-Tax Claims**

This Class shall consist of Allowed Priority Non-Tax Claims arising under Section 507(a)(4), (5) or (7) of the Bankruptcy Code. Each holder of an Allowed Priority Non-Tax Claim shall be paid in full, through quarterly cash payments commencing on the Effective Date, its Allowed Priority Non-Tax Claim, together with interest at the Plan Interest Rate, or as otherwise agreed, over a period through the fifth anniversary of the Effective Date.

The proof of claim deadline has not expired.  For information purposes, the estimated total of Class 2 Claims is $0.00 as of the date hereof.  However, to the extent that any creditor has an Allowed Priority Non-Tax Claim, including any alleged priority wage claim held by Mark Negro, such claim will be paid as a Class 2 Claim.  Class 2 is impaired.

**Class 3: Internal Revenue Service Secured And/Or Priority Tax Claim**

This Class shall consist of Internal Revenue Service's secured and/or priority tax claim filed in the amount of $189,955.14.The claim is comprised of a secured portion in the amount of $115,873.96, a priority portion in the amount of $57,862.34, and a general unsecured portion in the amount of $16,218.84.  The Debtor and the Internal Revenue Service have reached an agreement on the treatment of its claim.

The secured and priority portions of the Internal Revenue Service's claim will be paid in full in sixty (60) equal monthly payments beginning on the Effective Date of the Plan, together with interest accruing at the rate required by 11 U.S.C. § 511(which is currently at 4.00%).  The general unsecured portion of the claim will be paid as a Class 8 General Unsecured Claim.  Once the Class 5 Travis County Secured Tax Claim and/or the Round Rock ISD Secured Tax Claim are paid in full through the plan payments and the proceeds of the court-ordered sale of the Debtor's assets, any remaining proceeds from such sales will be paid to the Internal Revenue Service in addition to the monthly payments specified above until the Class 3 Claim is paid in full.  The minimum monthly payment to Class 3 is estimated to be $3,199.62.  The Debtor asserts that Class 3 is impaired.  Notwithstanding this assertion, the Court has found that this class is not an impaired accepting class under Section 1129(a)(10).

**Class 4: Texas Comptroller Secured And/Or Priority Tax Claim**

This Class shall consist of Texas Comptroller of Public Accounts' secured and/or priority tax claim filed in the amount of $72,321.14. The priority portions of the Texas Comptroller's claim will be paid in full within sixty (60) months from the Petition Date, in equal monthly installments, beginning on the Effective Date of the Plan, together with interest accruing at the rate required by 11 U.S.C. § 511 (which is currently 4.25%). The general unsecured portion of the claim will be paid as a Class 8 General Unsecured Claim. Class 4 is listed as impaired. As noted, it is not an impaired accepting class.

**Class 5: Travis County Secured Tax Claim**

This Class shall consist of Travis County's secured personal property tax claim filed in the amount of $11,515.90. The allowed secured claim of Travis County will be paid in full in sixty (60) equal monthly payments beginning on the Effective Date of the Plan, together with interest accruing at the rate required by 11 U.S.C. § 511. All proceeds from the court-ordered sale of the Debtor's assets located in Travis County will be paid to Travis County in addition to the monthly payments specified above until the Class 5 Claim is paid in full. Class 5 is listed as impaired. As noted, it is not an impaired accepting class.

**Class 6: Williamson County Round Rock ISD Secured Tax Claim**

This Class shall consist of Round Rock ISD's secured personal property tax claim filed in the amount of $3,389.94. This claim is secured pursuant to Chapter 32 of the Texas Tax Code. The allowed secured claim of Round Rock ISD will be paid in full in sixty (60) equal monthly payments beginning on the Effective Date of the Plan, together with interest accruing at the rate required by 11 U.S.C. § 511. All proceeds from the court-ordered sale of the Debtor's assets located in Williamson County will be paid to Round Rock ISD in addition to the monthly payments specified above until the Class 6 Claim is paid in full. The minimum monthly payment to Class 6 is estimated to be $75.41. The total of Class 6 Claim is $3,389.94 as of the date hereof. Class 6 is listed as impaired. As noted, it is not an impaired accepting class.

**Class 7: West Sixth Holdings, L.L.C. Secured Claim**

This Class shall consist of West Sixth Holdings, Inc.'s secured claim filed in the amount of $120,000.00. This claim is secured by a UCC-1 financing statement filed in the Texas Secretary of State's records on July 16, 2010. The collateral for the secured claim is the Debtor's trademarks, trade names, copyrights, patents, processes, and all applications therefore, know-how, trade secrets, confidential information, goodwill, assumed names, and all other intellectual property and all equipment located at the Mesa, Guadalupe, Round Rock and Commissary locations. The Debtor and West Sixth Holdings have reached an agreement on the treatment of its claim. The allowed secured claim of West Sixth Holdings shall be paid in full under the Plan. The Debtor will make equal monthly interest-only payments on the $120,000.00 claim amount beginning on the Effective Date of the Plan for the first twelve (12) months. Beginning on the one-year anniversary of the Effective Date, the Debtor will begin making equal monthly payments on the entire allowed secured claim of West Sixth Holdings amortized over ten (10) years accruing annual interest of eight percent (8%). Any and all accrued interest up to the Effective Date is forgiven by West Sixth Holdings by agreement. The minimum monthly

payment to Class 7 for the first twelve months is estimated to be $800.00. The amortized monthly payment beginning on thirteenth month is estimated to be $1,455.93. Class 7 is impaired and can constitute an impaired accepting class under Section 1129(a)(10).

## Class 8: Allowed General Unsecured Claims

This Class shall consist of all Allowed General Unsecured Claims, except Insider Claims. Each holder of an Allowed Unsecured Claim shall be paid in full, through prorated quarterly cash payments, commencing on the Effective Date, on its Allowed General Unsecured Claim, together with interest at the federal judgment rate of interest under 28 U.S.C. § 1961, until paid in full, or as otherwise agreed. The estimated total of Class 8 Claims is $458,268.02 as of the date hereof. The Debtor shall pay the Allowed Class 8 Claims with Cash, from funds available from operations of the Debtor. Beginning the calendar quarter starting after the Effective Date, the Debtor shall pay a minimum of $4,000.00 each quarter to Class 8, to be paid out to each Class 8 Claimant on a prorated basis. Additionally, the Debtor will pay seventy-five percent (75%) of its Quarterly Excess Free Cash Flow to Class 8, to be paid out to each Class 8 Claimant on a prorated basis. At such point in time that any of the Claims in Classes 1 through 7 are paid in full, all future funds that would have been used to pay such Claims will be paid each quarter to Class 8, to be paid out to each Class 8 Claimant on a prorated basis. If the Debtor has no Quarterly Excess Free Cash Flow during any quarter, the Allowed Class 8 Claims shall be paid in full in approximately nine and one-half (9½) years. However, the Debtor anticipates having Quarterly Excess Free Cash Flow that will permit the Debtor to make additional payments to the Allowed Class 8 Claims, thereby paying the Allowed Class 8 Claims in full more quickly. The Debtor believes that the holders of General Unsecured Claims will receive 100% of their Allowed Claim plus interest on their Allowed Claims at the federal judgment rate of 0.18%. The Plan proposes minimum monthly payments to the General Unsecured Class of $1,333.30 for the first 60 months of the Plan, then increasing monthly payments to $6,057.30, with an anticipated final payment in July, 2022 if only the minimum payment amount is made. However, the Plan contains a 75% net profit participation that will be added to the payments for the General Unsecured Claims. Based on the Debtor's financial projections contained herein at Exhibit C, the Debtor estimates that the General Unsecured Claims will be paid in full by June 2017. Class 8 is impaired.

## Class 9: Convenience Claims

This Class shall consist of all Allowed Convenience Claims. An Allowed Convenience Claim is any Allowed General Unsecured Claim in an amount less than $500.00. Each holder of an Allowed Convenience Claim shall be paid in full, on the Effective Date, in one lump-sum payment, with accrued interest from the Petition Date to the Effective Date at six percent (6%). The estimated total of Class 9 Claims is $3,245.93, plus accrued interest, as of the date hereof. Class 9 is unimpaired.

## Class 10: Insider Claims

This Class shall consist of all Allowed Insider Claims. The following are Insider Claims; however, such claims may be objectionable.

**Claimant Claim Number Claim Amount**

| Claimant | Claim Number | Claim Amount |
|---|---|---|
| Mark A. Negro | 32 | $333,210.24 |
| Mark A. Negro | 33 | $9,801.06 |
| Mark A. Negro | 34 | $53,140.73 |
| Mangia Pizza Management, LLC | 28 | Unknown |

Conditioned upon confirmation of the Debtor's Plan, Jeff Sayers is waiving any claim he may have against the Debtor. Each holder of an Allowed Insider Claim shall be paid its prorated portion of $20,000.00, to be paid in equal quarterly payments beginning the quarter after all Claims in Classes 1 through 9 are paid in full under the terms of the Plan. To the extent that any of the filed Class 10 Claims are claims for reimbursement or contribution due to joint and several liability, such claims will not be paid unless and until the holder of such Class 10 Claim provides proof of payment of the joint liability, as required by Bankruptcy Code § 502(e). Class 10 will not accrue interest. The estimated total of Class 10 Claims is $396,152.03, as of the date hereof. Class 10 is impaired.

## Class 11: Prepetition Equity Interests

This Class shall consist of all Prepetition Partnership Interests. All Prepetition Partnership Interests will be extinguished on the Confirmation Date.

The Debtor's Plan further provides that:

8.3.2 To the extent that any Creditor holds a prepetition security deposit against any Claim of the Debtor, the Creditor is authorized to offset such security deposit as of the Effective Date. The Debtor believes that HEB Grocery Company, L.P. is the only Creditor holding such a security deposit. That deposit is in the amount of $9,497.33.

8.3.3 On the Effective Date, Jeff Sayers will invest $5,000.00 in cash and provide a $20,000.00 promissory note to be paid in thirty-six (36) equal monthly payments, with six percent (6%) interest. Such contribution will be utilized by the Reorganized Debtor to first pay Administrative Claims and Professional Claims. Any excess funds will be used as a cash reserve for the Reorganized Debtor. Jeff Sayers will also waive and release the Debtor from all Claims held by Jeff Sayers against the Debtor, as represented by the filed proofs of claim of Jeff Sayers. In exchange for the contribution of cash, the note and the waiver of claims (collectively, the "New Value"), Jeff Sayers will be issued 99.9% of the equity as a limited partner in the Reorganized Debtor to be held in escrow by Gregory S. Milligan (or another person to be identified in the Plan Supplement that will be filed on or before August 10, 2011) as outlined in Plan Section 12. Additionally, Jeff Sayers shall establish a newly-formed entity to act as the general partner of the Debtor and hold the remaining 0.1% equity in the Reorganized Debtor (the "New General Partner"). Jeff Sayers shall be the 100% owner of the entity formed to serve as the general partner, the name and

governing instruments of the New General Partner shall be provided in the Plan Supplement to be filed on or before August 10, 2011.

In sum, both the Debtor's and Cloud Caps' proposed plans that are similar in treatment and classification, but for the separate treatment of the IRS's secured claim (which the Court has found not to be an impaired accepting class under § 1129(a)(10)) and the proposed treatment of payment of unsecured general claims.  As noted, Cloud Cap pays unsecured claims 22% of their allowed claims while the Debtor's plan could take as long as until the year 2022.

Cloud Cap Restaurants LLC Second Amended Chapter 11 Plan of Reorganization dated August 23, 2011 (Docket No. 119)

The Cloud Cap Plan tracks the Debtor's Plan but for a few notable differences.  In addition, the Cloud Cap Plan created an additional class of claims for HEB in ¶ 4.4, Class 2(a) as follows:

**Class 2(a): Allowed HEB Secured Claim**

This Class shall consist of Allowed Secured Claim of HEB Grocery Company secured by a security deposit related to the rejected lease between HEB and the Debtor.  Pursuant to 11 U.S.C. § 506(a), HEB's claim is a secured claim for which separate classification is required. The Allowed HEB Secured Claim shall be paid in full on or before 30 days after the Effective Date.  Pending payment of HEB's Secured Claim, HEB shall retain its liens on any Collateral Securing its Claim.  The Reorganized Debtor shall pay the Allowed Class 2(a) Claim with Cash from funds available from the Membership Purchase Agreement and operations of the Reorganized Debtor.

Prior to confirmation, Cloud Cap reached an agreement with HEB regarding the treatment of HEB's secured claim.[1]  The proposed treatment allows HEB to set off its security deposit against its pre-petition rent claim.[2]

---

[1] HEB had objected to Cloud Cap's Plan, but withdrew its objection and voted for Cloud Cap's Plan based on the modification.

[2] The Debtor was leasing space from HEB.

<u>Cloud Cap's Motion to Modify Plan and Approve Non-Material Modifications dated August 23, 2011 (Docket No. 118)</u>

Cloud Cap sought Court authority to modify its Plan of Reorganization prior to confirmation to reflect its agreement with HEB. Such relief is contemplated under section 1127 of the Bankruptcy Code, which provides in pertinent part that:

> (a) The proponent of a plan may modify such plan at any time before confirmation, but may not modify such plan so that such plan as modified fails to meet the requirements of sections 1122 and 1123 of this title. After the proponent of a plan files a modification of such plan with the court, the plan as modified becomes the plan.
> ****
> (c) The proponent of a modification shall comply with section 1125 of this title with respect to the plan as modified.
> (d) Any holder of a claim or interest that has accepted or rejected a plan is deemed to have accepted or rejected, as the case may be, such plan as modified, unless, within the time fixed by the court, such holder changes such holder's previous acceptance or rejection.
> ****
> (f)(1) Sections 1121 through 1128 and the requirements of section 1129 apply to any modification under subsection (a).
> (2) The plan, as modified, shall become the plan only after there has been disclosure under section 1125 as the court may direct, notice and a hearing, and such modification is approved.

28 U.S.C. § 1127.

Section 1125 of the Bankruptcy Code requires that a plan proponent provide interested parties with information that is adequate to allow them to evaluate the plan and to make an "informed judgment" thereon. 11 U.S.C. § 1125. Section 1126 of the Bankruptcy Code deals with acceptances and rejections of a plan, and provides, *inter alia*, that: (i) unimpaired classes are deemed to accept a plan; and (ii) plan votes may be solicited even prior to the commencement of a bankruptcy case, so long as the mandates of section 1125 are followed. 11 U.S.C. § 1126(b)(2).

Cloud Cap's Second Amended Plan resolves HEB's objections and the proposed treatment is limited to the treatment of HEB. HEB wanted to ensure that its right of setoff was

preserved. "The right of a creditor to set-off in a bankruptcy reorganization proceeding must be duly exercised in the bankruptcy court before the plan of reorganization is confirmed; the failure to do so extinguishes the claim." *In re Continental Airlines*, 134 F.3d 536, 542 (3d Cir.1998); *In re Silver Fox, LLC*, 2010 WL 2572602, at *4 (D.N.J. June 24, 2010). The proposed modification preserves HEB's right of setoff.

The Court finds that the Second Amended Plan does not adversely affect any creditor as the amounts payable under the Second Amended Plan are all better than or equal to the Plan as solicited. Thus, an accepting creditor is deemed to have accepted the Second Amended Plan. In *In re Dow Corning Corp.*, 237 B.R. 374, 377 (Bankr. E.D. Mich. 1999), the bankruptcy court determined that the modification did not adversely affect any of the creditors who had previously accepted the plan before the modification. *Id.* at 379.

> Bankruptcy Rule 3019 explains when it is necessary to resolicit parties who have previously voted on the plan. It enforces the practical and logical assumption that anyone who voted to accept the previous plan will be deemed to have accepted the modified plan if the modified plan "does not adversely change the treatment of [that creditor's] claim." F. R. Bankr. P. 3019. *See In re American Solar King Corp.,* 90 B.R. 808 (Bankr. W.D. Tex.1988); *In re Boroff,* 189 B.R. 53, 57 (D. Vt. 1995); *In re Trans World Airlines, Inc.,* 185 B.R. 302, 322 (Bankr. E.D. Mo.1995); *In re Frontier Airlines, Inc.,* 93 B.R. 1014, 1023 (Bankr. D. Colo.1988). *See also* 4 *Norton Bankruptcy Law & Practice 2d* § 94:1 (1999) Supplement to Vol. 4, p. 167 ("[C]ourts do not require notice of a modification if the modification does not adversely change a claimant's treatment. To enforce a literal interpretation of the Code and require formalistic notice when the modifications are not substantial, would needlessly delay confirmation and heighten the risk of a plan's failure.") (footnotes omitted).

237 B.R. at 378.

Does Cloud Cap's Plan Impair the Treatment of HEB's Claim?

Notwithstanding the Court's approval of the Plan modifications, the Debtor had a legitimate concern about the Plan's modification for voting purposes. Cloud Cap asserted that the HEB secured claim was impaired. The Debtor argued that Class 2(a) is Cloud Cap's attempt at manufacturing an impaired accepting class where one simply does not exist. The Debtor

argued that HEB's secured claim is not impaired. HEB holds in its account cash in the amount of $9,497.33 plus any accrued interest since its possession of the deposit, which will offset its claim against the Debtor on the Effective Date. HEB has held these funds since the inception of the lease, and its rights at this time, and under the Cloud Cap Plan, are no different than on the Petition Date.

Cloud Cap states that HEB's secured claim will be paid in full within 30 days with cash from funds available from the Membership Purchase Agreement and operations of the Reorganized Debtor. Cloud Cap does not state that HEB will release and/or offset the security deposit it holds as collateral. By a plain reading of Cloud Cap's Plan, HEB will retain the $9,497.33 cash security deposit *and* will be paid in full from funds of the Debtor. Arguably, rather than recognize the setoff, Cloud Cap has tried to create an impairment by delaying payment to HEB for 30 days. However, with HEB continuing to retain the cash collateral, HEB retains full rights to the collateral, including any accrual of interest.

The Court agrees with the Debtor that HEB's secured claim is not impaired, and, therefore, Class 2(a) is not an eligible voting class under § 1129(a)(10). Under both plans, HEB will be paid the full amount of its secured claim. In fact, HEB already has the funds, so there is no risk that it will not get paid nor is there any impairment of HEB's rights under the Cloud Cap Plan. Because the Debtor was in default of the HEB lease prior to the bankruptcy filing, HEB's rights to the deposit, pursuant to paragraph 3(b) of the HEB lease, vested prior to the bankruptcy. Only the bankruptcy automatic stay posed a statutory restriction on HEB's ability to offset the deposit. The Court finds that Cloud Cap cannot create an impairment by simply stating that HEB will be paid within 30 days when it will actually be paid on the Effective Date.

A class of claims is deemed unimpaired if the plan leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest.

11 U.S.C. § 1124(1). HEB's legal right to the security deposit will be the same on the Effective Date as it was upon the Debtor's default. Any impairment to the funds thus far has been the result of the automatic stay provisions of the Bankruptcy Code, not because of the treatment under the Plan. Therefore, HEB's rights remain unaltered.

To be an impaired class, the *plan itself* must cause the limitation on the creditor's legal, equitable, or contractual rights. **Solow v. PPI Enters., Inc. (*In re PPI Enters., Inc.*)**, 324 F.3d 197, 204 (3d Cir. 2003). As Judge Clark noted in **In re American Solar King Corp.**:

> A closer inspection of the language employed in Section 1124(1) reveals "impairment by statute" to be an oxymoron. Impairment results from what the *plan* does, not what the statute does. *See* 11 U.S.C. § 1124(1) ("a class of claims . . . is impaired under a plan unless . . . the *plan* leaves unaltered the legal . . . rights to which such claim . . . entitles the holder of such claim. . . .") (emphasis added). A plan which "leaves unaltered" the legal rights of a claimant is one which, by definition, does not impair the creditor. A plan which leaves a claimant subject to other applicable provisions of the Bankruptcy Code does no more to alter a claimant's legal rights than does a plan which leaves a claimant vulnerable to a given state's usury laws or to federal environmental laws. The Bankruptcy Code itself is a statute which, like other statutes, helps to define the legal rights of persons, just as surely as it limits contractual rights.

90 B.R. 808, 819-20 (Bankr. W.D. Tex. 1988).

Although Cloud Cap labeled HEB's secured claim "impaired" and solicited HEB's vote, the Class 2(a) class is unimpaired, and therefore, not a voting class.

<u>Objections to the Competing Plans</u>

Not surprisingly, each Plan proponent objected to the competing Plan. In summary form, the Debtor objected to Cloud Cap's plan as follows (*see* docket no. 114):

(a)     The Cloud Cap Plan is not proposed in good faith. Cloud Cap obtained standing in this case by the purchase of a *de minimus* claim in the amount of $244.66. Cloud Cap purchased the claim after initiating negotiations with the Debtor regarding a potential sale of the Debtor to Cloud Cap. The Debtor was warned that, if the negotiations did not go favorably for Cloud Cap, Cloud Cap would use its purchased claim to attempt to obtain control of the Debtor's

assets.  ***In re Allegheny Int'l, Inc.***, 118 B.R. 282, 289-90 (Bankr. W.D. Pa. 1990) (creditor promoting own plan to gain control of debtor).

(b)     The Cloud Cap Plan proposes to fund its Plan through contributions from the "Membership Purchase Agreement."  Cloud Cap's plan specifically states that the proponent will fund an amount equal to the aggregate of all allowed administrative claims, all allowed secured and priority claims and $119,000 to the general unsecured class.  However, the source of these funds, the extent that these funds have been raised, or the risk of failure to raise the requisite funds are not specified within the Cloud Cap Plan.

(c)     The Cloud Cap Plan does not have any accepting classes that prefer its Plan to the Debtor's Plan.  Pursuant to Bankruptcy Code §§ 1129(a)(8) and 1129(c), such an outcome makes confirmation of the Cloud Cap Plan over the Debtor's Plan improbable.

(d)     The Cloud Cap Plan attempts to limit the dollar amount of Allowed Administrative Claims. Bankruptcy Code § 1129(a)(9) contains no dollar limit on Chapter 11 administrative expenses, including the Debtor's attorneys.  To the extent that the Cloud Cap Plan is limiting the dollar amount of such expenses, the Plan is unconfirmable under § 1129(a)(9)(A).

(e)     The Cloud Cap Plan defines a Convenience Claim Reserve in its definition of "Reserves."  However, the Plan does not specify that such a reserve will be set up nor does it define what a "convenience claim" is under the Plan.

(f)     Class 9 of the Cloud Cap Plan sets forth the Contingent Reimbursement Claims. Such claims are defined as claims under Bankruptcy Code § 502(e).  While that section is clear as to the objectionable nature of such claims, a plan of reorganization cannot substitute for a claim objection.   To the extent that Cloud Cap requires such claims to be placed in Class 9, appropriate notice and a hearing will be required.

(g)     Plan Paragraph 5.2.9 is insufficient under Fifth Circuit law to preserve any causes of action owned by the Debtor. *See Crescent Resources Lit. Trust v. Burr*, 463 B.R. 423 (Bankr. W.D. Tex. 2011). To the extent that Cloud Cap wishes to reserve such causes of action post-confirmation, a specific reservation of rights is required.

(h)     The last sentence of Plan Paragraph 6.3 contains a post-confirmation exculpation provision that is outside the scope of Bankruptcy Code § 1141 and is therefore violative of Bankruptcy Code § 1129(a)(2).

(i)     The default provisions contained in Paragraph 6.4 of the Cloud Cap Plan are apparently limited to Taxing Authorities. The Plan then goes on to state that there are no priority tax claims in Paragraph 4.2.3. To the extent that the Cloud Cap Plan attempts to limit creditors' default remedies, the Plan is violative of Bankruptcy Code §§ 1123(a)(5) and § 1129(a)(2).

(j)     Paragraph 13.2 of the Cloud Cap Plan contains exculpation and release provisions inconsistent with the Bankruptcy Code. To the extent that the Plan attempts to expand the protections of Bankruptcy Code § 1141 to cover non-debtor entities, the Plan is violative of Bankruptcy Code §§ 1129(a)(2) and 1141.

Cloud Cap objected to the Debtor's Plan and made the following objections (*see* docket no. 112):

(a)     The Debtor's Plan violates the absolute priority rule of 11 U.S.C. § 1129(b)(2)(B) by permitting Sayers to retain full control over the Reorganized Debtor and to receive 100% of the equity in the Debtor. *See, e.g.*, *Bank of Am. Nat'l Trust and Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434 (1999) (old equity is disqualified from participating in a chapter 11 plan by contributing new value when opportunity is given exclusively to them without consideration of alternatives). Because the Plan allows the Debtor's insider equity holder to retain 100% equity in violation of the absolute priority rule, Cloud Cap argues that the Plan cannot be

crammed down, and confirmation is not possible.  "Whether the value is 'present or prospective, for dividends or only for purposes of control' a retained equity interest is a property interest." *Nw. Bank Worthington v. Ahlers*, 485 U.S. 197, 207-08 (1988) (quoting N. Pac. Ry. Co., v. Boyd, 228 U.S. 482, 508 (1913).

(b)     Further, although payment in full is a prerequisite to Sayers retaining 100% of the equity in the Reorganized Debtor, retention of control is awarded immediately without payment in full of all creditors.  The Debtor's Plan attempts a sleight of hand whereby a "board" will conduct the business of the reorganized debtor but where two members of the board will be selected by Sayers:

> [T]he three managers of the new general partner shall be comprised of: (1) one individual selected by Sayers (that individual may be Sayers), for so long as the Mangia Escrow has not distributed the stock in the company to holders of Allowed Claims, in which case it shall be an individual elected by the majority of the owners of the New General Partner; (2) an entrepreneur with experience in the restaurant business located in Austin, Texas, to be identified and the biographical information shall be provided in the Plan Supplement to be filed on or before August 10, 2011; and (3) an individual appointed by Sayers (the "Sayers Selected Manager").  [Debtor's Plan ¶ 12.5]

(c)     Cloud Cap argues that the Debtor's proposed Plan is not feasible. Section 1129(a)(11).  Cloud Cap argues that the Debtor has no prospects for capitalization of the Reorganized Debtor and is relying solely on ongoing operations to make payments due under the Plan.  There is no margin for error.  For example, the Debtor's May MOR-6 shows net income before taxes of $6,673.  Net cash flow is $5,580.  Total monthly payments due under the terms of the Plan are $7,530.53 per month in the first year and $8,186 per month in the second year, based on the summation of amounts set forth in the Plan.  Payment of administrative expenses consisting of attorneys' fees and unpaid post-petition payables, as explained herein, will completely strip the Reorganized Debtor of any existing cash reserves even after the capital infusion by Mr. Sayers.

Cloud Cap submits that in this case, the Debtor has failed to establish that the Plan is feasible because, among other things:  (i) the Debtor has insufficient capital reserves after paying professional fees and the expenses of the chapter 11 case; (ii) actual operating results in recent months show that there is insufficient net income to make the projected plan payments; and (iii) the Debtors' projections do not explain the various estimates for unsecured claims or how recent operating results will be greatly improved without additional capital expenditures.

(d)    Further, Cloud Cap contends that section 1123(a)(7) requires that a plan only contain provisions "with respect to the manner of selection of any officer, director, or trustee under the plan and any successor," that are "consistent with the interests of creditors." Under ¶ 12.5 of the Debtor's Plan, two of three board members will be selected by Mr. Sayers (and one will be Mr. Sayers), despite the fact that the risk of default remains with the unsecured creditors.

(e)    Even if the Court finds that a "new value" exception exists, the exception is not met in this case.

(f)    Cloud Cap further argues that section 1129(a)(3) of the Bankruptcy Code requires that a plan be proposed in good faith.  A plan lacks good faith if it does not have a reasonable likelihood of achieving a result that comports with the spirit of the Bankruptcy Code.  ***Tenn–Fla Partners v. First Union Nat'l Bank of Fla.***, 229 B.R. 720, 734 (W.D. Tenn. 1999); ***In re Future Energy Corp.***, 83 B.R. 470, 486 (Bankr. S.D. Ohio 1988).  The determination of whether a plan lacks good faith is based on the totality of the circumstances.  *Id.*

Under the Bankruptcy Code, the Debtor has a duty to maximize the value of the Debtor's estate for the benefit of creditors.  ***CFTC v. Weintraub***, 471 U.S. 343, 352 (1985).  In this case, the Debtor's lack of good faith in proposing the Plan is evidenced by the failure of the Plan to maximize the value of the Debtor's estate through a definitive marketing and sale process.  The filing of a competing plan demonstrates that the Debtor could have, but did not, market its assets.

The failure to market the assets of the estate also proves that the Debtor's Plan is not in the best interests of creditors. Here, the failure of the Plan to expose the Debtor's assets to the market to establish value violates, among other things, the best interest of creditors test. *See e.g., 203 N. LaSalle St. P'p*, 526 U.S. at 441 .

<u>Mark Negro's Objections to the Debtor's Plan (Docket No. 108)</u>

In addition, Mark Negro, who owns a majority interest in the limited partnership of the Debtor, voted in favor of Cloud Cap's Plan and filed an objection to the Debtor's Plan. Negro also objected to the Debtor's Plan due to lack of feasibility and that the Plan was not proposed in good faith. Further, Negro contends that the Debtor's Plan unfairly discriminates against him, that the Plan violates the absolute priority rule, and that the new value exception to the absolute priority rule does not apply.

(a) Like Cloud Cap, Negro contends that the Debtor's Plan violates the absolute priority rule of 11 U.S.C. § 1129(b)(2)(B) by permitting Sayers to retain full control over the Reorganized Debtor and to receive 100% of the equity in the Debtor. *See, e.g., 203 N. LaSalle St. P'ship*, 536 U.S. 434 (old equity is disqualified from participating in a chapter 11 plan by contributing new value when opportunity is given exclusively to them without consideration of alternatives). Because the Plan allows the Debtor's insider equity holder to retain 100% equity in violation of the absolute priority rule, the Plan cannot be crammed down, and confirmation is not possible.

(b) Negro argues that the Code does not expressly authorize a "new value" exception to the absolute priority rule and the Supreme Court has declined to definitively indicate whether the exception exists. *See Ahlers*, 485 U.S.at 203-04 n.3 ; *see also N. LaSalle St. P'p*, 526 U.S. 434.

(c)      Negro suggests that even if, however, the Court finds that a new value exception exists, the exception is not met in this case.  The Ninth Circuit has explained the application of the new value exception in ***Bonner Mall P'ship v. U.S. Bancorp Mortgage Co. (In re Bonner Mall P'ship)***, 2 F.3d 899 (9th Cir. 1993).  In *Bonner Mall*, the Ninth Circuit held that the new value exception was available if former equity holders contributed value that was "1) new, 2) substantial, 3) money or money's worth, 4) necessary for a substantial reorganization and 5) reasonably equivalent to the value or interest received." *Id.* at 908.  "Further, requiring a rigorous showing of both necessity and substantiality will assure the court that a debtor's equity holders are not eviscerating the absolute priority rule by means of a gratuitous, token cash infusion used primarily to buy cheap financing."  *In re Mortg. Inv. Co. of El Paso ("MICO")*, 111 B.R. 604, 619 (Bankr. W.D. Tex. 1990).  Here, the proposed contribution of $5,000 cash and a promissory note for $20,000 payable over three (3) years cannot be considered substantial, particularly in light of the projections, financial statements, and proposed monthly payments under the Plan.

### FACTS

The majority of the evidence taken in this case was whether to temporarily allow Jeff Sayers' claims so that he could vote.  Assuming that Sayers could vote, the Court took evidence on whether Sayers' claim was equity or a loan.  *See **Grossman v. Lothian Oil, Inc. (In re Lothian Oil)***,  650 F.3d 539 (5th Cir. 2011).  Further, the Court considered evidence as to whether Cloud Cap's purchase of a claim and negative vote was cast in bad faith to frustrate confirmation. *See **In re Applegate Prop., Ltd.***, 133 B.R. 827 (Bankr. W.D. Tex. 1991).  The Court also took evidence as to whether Sayers' negative vote for the Cloud Cap Plan (which would keep an impaired class from accepting) was cast in bad faith to keep Cloud Cap's Plan

from being confirmed.  Finally, notwithstanding a number of legal objections under section 1129, the Court was required to make a determination as to the feasibility of each plan.

Jeff Sayers

Jeff Sayers is the founder of the Debtor.  He opened his first store in 1988 and expanded to several locations.  Sayers explained that he is not a limited partner of the Debtor, but rather has an equity interest in a limited partner that owns fifty percent of the Debtor.  Sayers stated that he hired Mark Negro in 1998 to be the operations manager of the Debtor and in 2000 Negro took over financial duties for the Debtor.

Thereafter in 2004, the Debtor looked to expand its operations to multiple locations. John Kincaid was brought in to invest and expand Mangia's business; when expectations did not meet financial reality, Negro and Sayers agreed to convey two stores to Kincaid in satisfaction of his investment in 2009.  After the sale to Kincaid, Sayers became more involved in the day to day operations of Mangia.  Sayers testified that cash flow was poor and that sales taxes were not being paid to the Texas Comptroller.  Further, Sayers stated that in September 2010 the IRS showed up at one of the Debtor's locations to exercise its enforcement powers.  After meeting with the IRS, Sayers was assessed a trust fund recovery penalty ("TFPR")[3] under 26 U.S.C. § 6672.  Sayers asked Negro to resign (which he did), and Sayers further reduced restaurant operations to one location.

Because Mangia had significant tax debts to both the IRS and Texas Comptroller, and ongoing operations could not pay vendors timely, Sayers put the Debtor into bankruptcy in November 2010.  Sayers kept operations to one location and licensed the Mangia name to two other locations.  The Debtor's plan is proposed with one restaurant location with a license of the name at the Austin Airport.

---

[3] Sayers testified that Mark Negro has an additional TFRP.

During the pendency of the case, Sayers attempted to sell the Debtor.  Sayers also entered into serious negotiations with Cloud Cap to sell the restaurant.  When the negotiations did not yield a sale, Cloud Cap purchased an unsecured claim and filed a competing plan.

Sayers explained that he will personally infuse capital in the Debtor of $25,000 -- $5,000 to start with and $20,000 over time.  Further, Sayers stated that he will forgive his debt to the Debtor.  Sayers filed a proof of claim listing personal loans to the Debtor in the amount of $89,123.74 (Debtor's Ex. 8).  The basis for the proof of claim is the Debtor's balance sheet as of March 10, 2011, and a copy of a QuickBooks entry evidencing Sayers' payments to vendors. Sayers also filed a proof of claim in the amount of $814,235.75 for personal guarantees that include debts owed to the IRS, the Texas Comptroller,[4] lease payments for the Mesa store, and several Debtor credit cards.  (Debtor's Ex. 8, POC No. 27).  Sayers also filed a proof of claim in the amount of $16,268.82 for unpaid wages and health benefits.  Sayers attaches the same March 10, 2011 balance sheet and transactions by account ledger as evidence for the claim.  (Debtor's Ex. 8, POC  No. 26).

As to feasibility, Sayers stated that the $25,000 capital infusion was necessary to pay attorney's fees and that he would pay the Debtor's attorney's fees at the rate of $500 per month or a percentage of income each month.  He also explained that the Debtor's forecast of business (Debtor's Ex. 6, Revised 11-Year Financial Forecast (Amended Plan Ex. C)) is based upon an average of Debtor's business for the past five years, but that actual expenses were used for January-July 2011 projections.  Sayers believes that he can meet income projections with slight menu increases, no real changes to operations, and an anticipated increase in business.  Business income is derived solely from license fees regarding the use of Debtor's name and operations of one restaurant.  Sayers also opined that with additional profits the Debtor could pay off

---

[4] Sayers' liabilities to the IRS and Texas Comptroller are not "guarantees" but rather his liability as the responsible officer of Mangia and his failure to remit taxes.

unsecured creditors as soon as 2017. He also noted that the reorganized Debtor would have three members (including Sayers) and that Sayers would not receive the Debtor's equity until unsecured creditors are paid in full.

Sayers also testified that the reason he did not accept Cloud Cap's offer to buy Mangia or vote in favor of Cloud Cap's Plan was that Cloud Cap's Plan only pays 22% of all allowed unsecured claims. Notably, Cloud Cap does not guarantee payment of all tax claims, including trust fund taxes for which Sayers is personally liable, or pay Sayers' claims which were subject to claims objections at the time of confirmation.

Notwithstanding Sayers' confidence in the Debtor's projections, he acknowledged that he did not compare the Debtor's plan projections to actual expenses or the Debtor's monthly operating reports ("MOR"). Sayers agreed that the MORs showed post-petition liabilities of over $57,000 for administrative claims and that he has a side deal to pay his bankruptcy counsel fees. Further, while Sayers asserted that he did not know that federal and state taxes were not being paid prior to filing bankruptcy, he was aware that the Debtor had serious cash flow issues. Sayers also stated that during the period of March – August 2011, the Debtor only had sufficient income to pay the proposed plan payment for one month. Sayers qualified the Debtors' cash position by explaining that the monthly operating expenses include expenses such as U.S. Trustee fees, and that the accrual of professional fees would be paid over time and would not adversely affect payments under the Debtor's Plan.

David Gebser

David Gebser has been the bookkeeper for the Debtor since November 2010. He performs the day to day book keeping for the Debtor, keeps the Debtor's records, and prepares and signs the Debtor's MORs. Gebser testified that actual revenues for 2011 as compared to projected revenues indicates that revenues of $1.2 million exceeded projected revenues of $1.164

million.  Gebser admitted that the Debtor's projections do not include any allowance for equipment repair and maintenance.  Further, Gebser stated that he thought bankruptcy counsel's fees were approximately $115,000 with a retainer of $9,500.  The Debtor's projections do not include payment of professional fees.  In addition, the Debtor's actual profits are skewed because the Debtor is providing pizza to the Comptroller's Office in partial satisfaction of its debt.

Michelle Musick

Michelle Musick served in different capacities for the Debtor.  Musick worked for the accountant who has prepared Debtor's tax returns.  She also prepared the Debtor's books and records prior to Gebser.  She also assisted in preparing Sayers' proof of claim in that she prepared the transaction by account report from QuickBooks.  She testified that there is a note payable to both Sayers and Negro, but she could not provide any proof of a note payable.  Musick stated that there has not been an audit of the QuickBooks accounts.  She also testified that Sayers' loans to the Debtor could not be classified as capital contributions because Sayers was not an owner of the Debtor.

David Turpin

Turpin is a manager and member of Cloud Cap Group.  He has an extensive background in both finance and real estate operations that includes working for Temple Inland, a masters degree in finance from the University of London, and ownership of a forest line and manufacturer of paper products.  He helped form Cloud Cap in 2011 to acquire the Debtor.  Turpin testified that he had the required funds on hand to implement Cloud Cap's Plan and pay creditors.  (Cloud Cap's Ex. 10.)  Turpin testified that Cloud Cap has $305,000 on deposit which would be sufficient to pay administrative costs, but not the Debtor's bankruptcy counsel, make initial payments to taxing authorities, and a 22% contribution to unsecured creditors in the amount of $124,000 (22% of $560,000).  Sayers' equity ownership interest would be canceled.

Turpin indicated that three members of Cloud Cap would be involved in the management of Mangia.  One of the members has prior management experience with Gattis.  Turpin believed it would take four to six months to stabilize the Debtor's cash flow.  Cloud Cap would then seek out new sites to start new restaurants.  Turpin also believed that the Debtor's cost of goods and personnel costs were high when compared to overhead.

Turpin admitted on cross-examination that Cloud Cap does not have an accepting impaired class if Sayers' vote is counted.  He said he found out about Mangia when its bankruptcy filing was noted in a local paper.  Turpin was unclear as to whether he told Sayers during an initial meeting that he had purchased a creditor claim at a discount.  Nonetheless, Turpin agreed that when he could not consummate a sale for Mangia, Cloud Cap elected to purchase a claim to have standing to file a competing plan.  Turpin also recognized that in connection with the solicitation of Cloud Cap's Plan that he referenced that Cloud Cap had $1 million in planned capital but only had the $305,000 on deposit.  Turpin also stated that he has talked to Mangia's vendors and also West Holdings – a Class 7 Creditor – in hopes of West Holdings casting an affirmative vote for Cloud Cap so that Cloud Cap would have an impaired accepting class.

## ANALYSIS

Evaluating Competing Plans

Section 1129(c) states that:

> Notwithstanding subsections (a) and (b) of this section and except as provided in section 1127(b) of this title, the court may confirm only one plan, unless the order of confirmation in the case has been revoked under section 1144 of this title.  If the requirements of subsections (a) and (b) of this section are met with respect to more than one plan, the court shall consider the preferences of creditors and equity security holders in determining which plan to confirm.

*Collier on Bankruptcy* notes that section 1129(c) has not been heavily litigated because the cost of confirming two plans is too expensive.  7 Collier on Bankruptcy ¶ 1129.06 (16th Ed.

2012). As discussed herein, the initial inquiry the Court must make is whether either Plan was preferred by a majority of creditors. *Collier* suggests that if the Court cannot determine a consensus among claims holders, then the Court should give weight to which plan is preferred by ownership interests, and give the debtor the best chance to organize. *Id.* *Collier* lists four considerations a court should employ in determining which plan to approve under section 1129(c): (1) the type of plan; (2) the treatment of creditors and equity security holders; (3) the feasibility of the plan; and (4) the preferences of creditors and security holders. *Id.*

The Debtor's Plan proposes to pay all classes of claims in full over time. Cloud Cap provides an initial distribution to tax and unsecured claims, makes no reservation for the Debtor's professional fees or Jeff Sayers' claims (which are treated as canceled equity claims), and does not guarantee full payment of all taxing claims.[5]

On an initial basis, Cloud Cap's Plan is more feasible because it has funds on hand to pay creditors. That said, Cloud Cap only pays a finite set of creditors and in some cases, a percentage of the claim. The Debtor's Plan pays all creditor claims in full with interest, and does not convey equity to Sayers until all claims higher in priority are paid. As a result, creditors are given a choice between an immediate pro rata payment or payment in full over time at a small rate of interest.

When the plan packet went out in this case, creditors were given the option to vote or reject each plan. Creditors were also given the option if they voted for both plans to indicate which plan they preferred. (Doc. #137.) The Debtor also filed its own ballot summary which indicates that it had four accepting classes: Class 3 – IRS secured and/or priority claim (as noted herein this claim cannot be included as an impaired accepting class); Claim 5 – Travis County

---

[5] ¶ 4.5.1 of Cloud Cap's Plan proposes to pay the IRS's secured claim from asset sales after paying Travis County and Round Rock ISD. The Plan does propose to pay the IRS within sixty months from the Effective Date. Notwithstanding these treatments, Turpin testified that not all of the IRS's claim may be paid.

Secured Tax Claim (unimpaired); Class 6 – Williamson County Round Rock ISD Secured Tax Claim (unimpaired); and Class 7 – West Sixth Holdings, L.L.C. Secured Claim (impaired).  As such, the Debtor does have an impaired accepting class and can satisfy section 1129(a)(10).

Cloud Cap does not have an impaired accepting class unless Jeff Sayers' claims are discounted.  The Court temporarily allowed Sayers' claims for voting purposes.  As described herein, Cloud Cap also objected to Sayers' claim/vote on the basis that his claims should be deemed equity and not as an unsecured claim.

Not every claimant who voted indicated a preference as to the Plan.  Of those creditors who expressed a preference as to which plan, the Debtor's Plan was the preferred plan.  To begin with, the taxing authorities – IRS, Round Rock ISD, and Travis County, all preferred the Debtor's Plan.  More importantly, of the unsecured claimants that expressed an interest, unsecured creditors preferred the Debtor's Plan by a count of 4 to 2.  Further, the amount of the unsecured claims that voted for the Debtor's Plan also exceeded the amount of unsecured creditor claims that voted for Cloud Cap's Plan.  As such, section 1129(c) states that even if both plans are confirmable under section 1129(a and b), the Court should defer the wishes of creditors in this case.  *See **Applegate Prop., Ltd.**, 133 B.R. at 835.

Is the Debtor's Plan Confirmable under Section 1129(a) and (b)?

Section 1129(a) requires the plan proponent to satisfy all requirements under subsection (a), and if applicable, subsection (b) as well.  Should the Court sustain any of the parties' objections to a plan, then confirmation fails.

(1)     The Debtor's Plan Violates the Absolute Priority Rule.

Cloud Cap and Negro both argue that the Debtor's Plan violates the absolute priority rule.  As this Court noted in *MICO*, the absolute priority rule requires that senior claims be paid in full before any junior class can receive or retain any property.  *MICO*, 111 B.R. 617 (citations

omitted).  The Debtor's Plan proposes to pay all unsecured claims in full over time with interest.[6] The Debtor maintains that Sayers does not get full control or ownership of the Debtor until all senior claims are paid.  On an initial basis, all claims under the Plan appear to be paid under the Plan.  The Debtor contends that for purposes of analyzing application of the absolute priority rule, § 1129(b)(2)(B) makes a distinction between § 1129(B)(ii), which discusses treatment for unsecured creditors and that unsecured creditors cannot receive or retain any interest in property until senior claims are paid, and § 1129(a)(5)(A)(ii), which discusses the disclosure of any insider who will serve as a director, officer, or voting trustee of the debtor and limits an insider to those persons who have a direct equity interest in the debtor.

In doing so, the Debtor makes an elaborate argument that because Sayers does not have an equity interest in the Debtor but an ownership interest in an equity owner of the Debtor, the absolute priority rule does not apply to the Debtor because he is a non-equity holder insider.  *See In re Greenwood Point, LP*, 445 B.R. at  910  (absolute priority rule does not apply to insiders who are not the current owners of debtor); *Troy Sav. Bank v. Travelers Motor Inn*, 215 B.R. 485, 494 (Bankr. N.D.N.Y. 1977) (no prohibition against a private sale to an insider through plan confirmation).[7]  Further, the Debtor posits that the absolute priority rule does not apply because Sayers does not get his ownership interest until all classes are paid.

Sayers' testimony regarding payment of claims clearly indicates that the Plan does not provide for payment of bankruptcy counsel fees, which are estimated to exceed $100,000. Sayers stated that the purpose of his capital infusion of $25,000 was to pay the Debtor's counsel fees through a separate arrangement.  In *MICO*, this Court held that the capital infusion

---

[6] The Court questions whether the federal judgment rate is the appropriate discount rate for payment of unsecured claims.  No evidence was presented on this point.  *See In re Perez*, 30 F.3d 1209, 1215-16 (9th Cir. 1994) (payment of unsecured claims without interest over time in chapter 11 plan violates § 1129(b)(2)(B)(i)).  Nonetheless, because the Debtor does provide some rate of interest on payments to unsecured creditors, the treatment of unsecured creditors under the Debtor's Plan is facially valid.

[7] See ¶ 7.15 of the Debtor's Plan, which provides that Sayers gets 99.9% of the equity as a limited partner in the Reorganized Debtor to be held in escrow until all claims are paid.

exception is still viable under applicable case law. *MICO*, 111 B.R. at 618. That said, the Court must again consider whether the requirements of the capital infusion exception have been met. Both Cloud Cap and Negro have correctly argued that Sayers' immediate control of the Debtor violates the absolute priority rule because control is a retained property interest. *Ahlers*, 485 U.S. at 207-08. Further, they maintain that the Debtor has not met the requirements of the capital infusion exception.

As explained by the Court in *MICO*, 111 B.R. at 620, the new value exception to the absolute priority rule "may only be used in those instances where the capital is *necessary* for the continued operations of the debtor. It is not merely a mechanism for existing equity holders to buy back, at bargain prices, their ownership interest in the reorganized debtor." In *MICO,* the debtor's equity holder proposed to pay unsecured creditors in full on the effective date and pay the undersecured creditor over 12 years. There the court found the proposed "new value" to fund the buy-off of unsecured creditors was merely a mechanism to buy votes to circumvent the confirmation requirements. Here, the proposed equity infusion is so minimal as to evade this district's interpretation of the absolute priority rule. The payment is too small to constitute a necessary capital infusion, it is not substantial, and is not reasonably equivalent to the value received.

The Court also finds and agrees with Cloud Cap and Negro that the Debtor, through Sayers, has not satisfied the capital infusion exception to the absolute priority rule. As a starting point, the *MICO* decision found that it must be necessary to the reorganized debtor. *MICO*, 111 B.R at 619. Further, it must be substantial and essential. *Id.* This Court has found that the capital infusion exception serves "the narrow purpose of affording the Debtor the capital necessary to survive." *In re Greystone III Joint Venture*, 102 B.R. 560, 575 (Bankr. W.D. Tex. 1989). As such, the court should only allow the exception where the reorganizing enterprise

needs the capital investment in the first place.  *Id.* at 620.  Sayers testified that the purpose of the capital infusion was to pay attorney's fees, not fund business operations.  In fact, Sayers stated that he believed that with some minor adjustments, the Debtor did not need a capital infusion because the Debtor made sufficient income to fund operations and debt service.  As such, the whole point of infusing capital was to pay attorney's fees.  Like the *MICO* case, the purpose of the capital infusion is to pay claims, not fund operations.  Therefore, the basis for Sayers' infusion fails.[8]

The Court agrees with Cloud Cap that Sayers is both an insider and equity holder of the Debtor.  Sayers is the owner of the general partner who controls the Debtor.  Should the Debtor's Plan be confirmed, Sayers gets immediate control of the Debtor notwithstanding Milligan's retention of equity.  This Court has found that control may be considered a property interest when applying the absolute priority rule.  *See **In re Introgen Therapeutics***, 429 B.R. 570, 585 (Bankr. W.D. Tex. 2010).

In *Introgen*, the Court had to decide if the right to the seat on a Liquidating Trust Board should also be considered a property interest.  The Supreme Court has stated that, even in the context of an insolvent business, "[w]hether the value is 'present or prospective, for dividends or only for purposes of control' a retained equity interest is a property interest" for purposes of the absolute priority rule.  ***Ahlers***, 485 U.S. at 207-08 (internal citations omitted).  The Court continued, stating that "even in a sole proprietorship, where 'going concern' value may be minimal, there may still be some value in the control of the enterprise." ***Introgen***, 429 B.R. at 586 (citing ***Ahlers***, 485 U.S. at 208).

The Tenth Circuit relied on this in determining that a debtor's retention of control precluded compliance with the absolute priority rule.  ***Unruh v. Rushville State Bank***, 987 F.2d

---

[8] Sayers' forgiveness of his loans does not alter this analysis.

42

1506, 1509 (10th Cir. 1993). Other courts have similarly held that "there is 'value' in the retention by the equity security holder of *control* of the reorganized company." ***In re Genesee Cement, Inc.***, 31 B.R. 442, 444 (Bankr. E.D. Mich. 1983) (emphasis in original). Other courts have held that even indirect control may qualify as a prohibited property interest. For example, a court denied confirmation where two debtor shareholders, who were brothers, proposed a plan to transfer the debtor's corporate assets to a new corporation controlled by their parents, concluding that the plan indirectly allowed the debtor's stockholders to retain control of the corporate assets. ***In re Perdido Motel Group, Inc.***, 101 B.R. at 291-92.

An Illinois bankruptcy court similarly held, in relying on *Ahlers*, that "the power to control a corporation, through its board of directors, that a majority shareholder has, is a separate property interest, distinct from the value of the shares themselves." ***In re 4 C Solutions, Inc.***, 302 B.R. 592, 597-98 (Bankr. C.D. Ill. 2003). In that case, the court refused to confirm a plan that provided stock to a majority shareholder of the debtor's holding company, who had exercised control over the debtor derivatively through his ability to control debtor's board of directors by way of his control of the holding company. *Id.* at 598.

What this line of cases explicitly provides is that control over a company will be considered a property interest for purposes of determining if there is a violation of the absolute priority rule. As such, the Court finds the Debtor's arguments unavailing. Sayers presently and prospectively maintains control of the Debtor. Therefore, his retained interest as proposed in the Plan violates the absolute priority rule.

(2)     The Debtor's Plan Unfairly Discriminates Against Negro.

Cloud Cap also objects to Debtor's Plan because, pursuant to 11 U.S.C. § 1129(b), a dissenting class or creditor must receive value allocated to the class consistent with the treatment afforded other classes with similar legal claims. ***MICO***, 111 B.R. at 614. In *MICO*, unsecured

creditors were paid in full while the undersecured creditor was amortized over 12 years.  Here, Cloud Cap alleges that the Debtor's Plan contains two instances of unfair discrimination.  First, the Debtor's Plan proposes to pay the Class 7 claim of West Sixth Holdings, LLC ("WSH") in full with 8% interest.  WSH asserts a secured claim against the Debtor's intellectual property and certain equipment.  Cloud Cap believes that the collateral securing WSH's claim is worth less than $40,000, resulting in a $80,000 deficiency claim.  Properly treated, then, the deficiency should be treated similarly to Class 8 of the Debtor's Plan where the constituents receive only 22% interest.  As the Court recounted in *MICO*, the more favorable treatment of a similarly situated claim compels denial of confirmation based on unfair discrimination under 11 U.S.C. § 1129(b).  "Absent demonstrable evidence by the debtor of the *need* for the preferred payment to one creditor over others who possess similar claims, there appears to be no reason to allow such a provision."  *MICO*, 111 B.R. at 615 (emphasis in original).  Paying 8% interest on a deficiency claim while unsecured creditors receive less than one half of one percent cannot be justified in this case.

The Court disagrees with Cloud Cap, finding that absent valuation or objection to WSH's claim, it is deemed allowed as filed.  Therefore, any argument regarding unfair treatment lacks evidentiary support.

Also, the Debtor's Plan purports to award sole control and equity to Sayers while Negro, a 49% owner, receives nothing, violating both sections 1129(b) and 1123(a)(4).  The Debtor further suggests that only Mr. Negro's claims are subject to equitable subordination and reserves the right to reclassify his claims on that basis.[9]  As the Fifth Circuit stated, "equitable subordination is remedial, not penal, and in the absence of actual harm, equitable subordination is inappropriate."  *In re SI Restructuring*, 532 F.3d 355, 361 (5th Cir. 2008).

---

[9] This position is tenuous given the high bar set for equitable subordination set by the Fifth Circuit in *In re S.I. Restructuring*, 532 F.3d 355 (5th Cir. 2008).

Negro argues that a plan may only be confirmed if it does not discriminate unfairly and is fair and equitable.  11 U.S.C. § 1129(b)(1).  Under section 1123(a)(4), a plan shall "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest." 11 U.S.C. § 1123(a)(4).  A dissenting class must not only receive "fair and equitable" treatment, but must also receive treatment that allocates value to the class consistent with the treatment afforded other classes with similar claims.  *MICO,* 111 B.R. at 614.  In determining whether discrimination of claims are unfair, courts apply a four-part test: (i) whether the discrimination is supported by a reasonable basis; (ii) whether the debtor can confirm and consummate a plan without the discrimination; (iii) whether the discrimination is proposed in good faith; and (iv) the treatment of the classes discriminated against.  *Id.* at 614-15.

Negro contends that the Plan unfairly discriminates against Negro's interest and claims. With respect to Negro's interest, the Plan does not provide a similar opportunity for Negro to take part in providing "new value" in an effort to retain equity interest in the Debtor.  The Plan exclusively provides this opportunity solely to Sayers.  When considering the four-part test articulated above, this amounts to unfair discrimination because there is no reasonable basis for the failure to provide Negro the same opportunity as provided to Sayers to extend new value to retain his equity interest.  Moreover, the Debtor can confirm and consummate the Plan without the discrimination by offering Negro the same opportunity and allowing both Negro and Sayers to participate in extending new value and retain an equity interest.  Further, the discrimination is not proposed in good faith considering that Sayers retains all equity under the Debtor's Plan, whereas Negro would lose all of his equity.  Accordingly, the Court finds that the treatment of Mark Negro's interest is in contrast to that of Sayers, which amounts to prohibited, unfair discrimination.

Cloud Cap and Negro also argue that the Debtor's Plan violates the Supreme Court's holding in *203 North LaSalle* that they were not allowed to bid or contribute new value. In *203 North LaSalle*, the Supreme Court did not explicitly rule on the viability of the new value exception, but found that if it did exist, equity could not be the only party to bid or provide equity or offer a competing plan. 536 U.S. at 454-55.

Here, Cloud Cap cannot complain about not being able to bid because it did file a competing plan. As already discussed, Negro says he was not offered the chance to bid or infuse capital. Negro did not testify. Sayers stated that he asked Negro to leave Mangia because of mismanagement and accrual of taxes. This Court questions what evidence is required under *203 North LaSalle* to demonstrate what a debtor must do to show it offered equity holders a chance to bid; but what is clear is that the Debtor eliminated Negro's equity interest while preserving Sayers'. In doing so, the Debtor precluded Negro from retaining his interest so he could bid. As such, the Court finds such treatment in violation of *203 North LaSalle*.

(3)     The Debtor's Plan Is Not Feasible.

Both Cloud Cap and Negro argue that the Debtor's Plan is not feasible. The Fifth Circuit has held that a debtor must show by a preponderance of the evidence that a plan is feasible, which means that it is not likely to be followed by liquidation or further financial reorganization. *In re Save Our Springs Alliance*, 632 F.3d 168, 172 (5th Cir. 2011). This Circuit has articulated a six-part test in deciding whether a plan is feasible. *Id.* at 173. The Fifth Circuit has also concluded that the court must consider all six factors. Those six factors are described as follows:

(1)     the adequacy of the debtor's capital structure;

(2)     the earning power of the debtor's business;

(3)     economic conditions;

(4)     the ability of debtor's management;

(5)     the probability of the continuation of the same management; and

(6)     any other related matter that may determine the prospects of successful operations to enable performance of the plan.

*Id.* at 173 n.6 (citation omitted).

The Court finds that factors four and five are met because the evidence clearly demonstrated Sayers' willingness to operate the business to retain his equity. Further, factor six is not applicable because there are no additional factors that would support confirmation of the Debtor's Plan other than what was already addressed at the confirmation hearing.

Factors one through three are more problematic for the Debtor. The Court recognizes that the Debtor is not required to guarantee success, but "only a reasonable assurance of commercial viability." *Id.* at 172 (citations omitted). There was little evidence about the Debtor's capital structure, other than Sayers had expended significant funds to keep the Debtor operational. Further, other than the capital infusion of $25,000, which is earmarked for professional fees, there are no other sources for the Debtor to tap for further capital.

Second, while the Debtor's operations have stabilized, the Debtor's MORs do not demonstrate that the Debtor makes enough income to pay operational costs and fund plan payments. While the Court recognizes that the Debtor will not have to pay the same costs of being in bankruptcy, such as continuing counsel fees, the fact remains that the Debtor now only has one operating restaurant and a license fee arrangement. The Debtor has no allowance for equipment maintenance or property upkeep. Also, the Debtor failed to explain how it could

absorb escalating food prices and utilities, yet keep its restaurant competitive.  In addition, the Debtor did not explain adequately how it will also pay professional fees.  The Court questions how much more income the Debtor can generate if historical performance demonstrates that income does not exceed expenses and plan payments with any degree of commercial viability.

As to economic conditions, the Court received a number of letters from patrons of the Debtor.  These letters were unsolicited and not introduced directly into the record.  Nonetheless, the letters are an indication of Mangia's standing in the community.  This support, however, does not override economic conditions in that local establishments are subject to both a local and national economy.  As the economy weakens or stalemates, a local business with an already established client base can only be expected to have so much financial support.  The Debtor did not show how it could increase revenues much further than it had already, other than vague references to price increases and changes to the menu.  As such, the Court finds that the Debtor has not met its burden regarding feasibility.

The majority of objections that Cloud Cap and Negro raised focused on the absolute priority rule, unfair discrimination, and feasibility.  Given that the Court has sustained these objections and will deny confirmation of Debtor's Plan, the Court finds it unnecessary to rule on the parties' remaining arguments and what the Court would describe as subsidiary objections.

Confirmation of Cloud Cap's Plan.

The Debtor's objections to Cloud Cap's Plan are more limited in scope.  To begin with, the feasibility of Cloud Cap's liquidating plan have been refuted because Cloud Cap has uncontroverted proof that it has funds available to pay claims.  Second, the Court questions how Cloud Cap can propose no payments to the Debtor's bankruptcy counsel fees just because counsel did no work for Cloud Cap.  Counsel for Cloud Cap offers no legal authority that allows

Cloud Cap not to pay Debtor's legal fees.[10]  As such, because this provision does not comply with 11 U.S.C. § 1129(a)(9)(A), the Court will deny confirmation of Cloud Cap's Plan on this basis.

In addition, the Court finds that the Debtor's objections regarding the convenience claim reserve, contingent reimbursement claims preservation of causes of action, exculpation clauses, default language, and release provisions could all possibly be cured through plan amendment to conform to the Code or applicable case law.  Had these objections been the only objections, the Court would have sustained the Debtor's objections and required further amendment.  Moreover, the Court believes these types of plan amendments would not require further solicitation.

Two objections do remain that the Court must consider.

(1)    The Acquisition of a Creditor Claim for the Limited Purpose of Proposing a Competing Plan is Bad Faith.

Section 1121(b) grants the debtor the exclusive rights to file a plan for a period of 120 days after the order of relief is entered.  Unless the debtor seeks an extension of exclusivity, after the 120-day period expires, any party in interest, including a creditor, may file a plan.  11 U.S.C. § 1121(c).  Here, the Debtor failed to extend exclusivity and file a plan.  As such, the Debtor was subject to a competing plan being filed.  The Debtor suggests in its pleadings that such conduct constitutes bad faith under sections 1126(e) and 1129(a)(3).  While both sections deal with "good faith," their application is different.

The Debtor argues that the Court should designate the Cloud Cap vote on its Plan not in good faith because it was obtained for the limited purpose to frustrate confirmation of the Debtor's plan.  This Court previously dealt with a creditor's good faith in voting under

---

[10] Notably, although the Debtor objected to this provision, Debtor's counsel – the potential administrative claimant – did not.  *See* 11 U.S.C. § 1128(b) ("a party in interest may object to confirmation of a plan").  That said, Debtor's counsel's fees were allowed on an interim basis.  Therefore, the Court can find no basis as to how Cloud Cap cannot provide for payment of the Debtor's counsel fees.

Section 1126(e). *See SOS*, 388 B.R. 202. There, the Court examined the various factors to be considered in evaluating whether the creditor voted with an ulterior motive other than preservation of its claim. *Id.* at 232. The Debtor suggests that the only reason that Cloud Cap voted against the Debtor's Plan was to prevent confirmation. Ultimately it does not matter why Cloud Cap voted negatively because the Debtor already has an impaired accepting class and, as noted, creditors preferred the Debtor's Plan to Cloud Cap's. Therefore, this Court need not examine further Cloud Cap's motives under section 1126(e).

The Debtor also argues that by acquiring a claim and proposing a competing plan, Cloud Cap's conduct and intentions constitute bad faith. As already explained, Cloud Cap's acquisition of a claim and negative vote as to Debtor's Plan is of no consequence because the Court has found that the Debtor did have an impaired accepting class under section 1129(a)(10). The Debtor further argues that the purchase of a creditor claim for a *de minimus* amount and proposing a competing plan to acquire the Debtor's assets is also bad faith.

There are several considerations that mitigate against the Debtor's argument. Congress explicitly granted a Chapter 11 debtor the exclusive right to propose a plan and the ability to extend that exclusive right for additional periods of time. 11 U.S.C. § 1121(b) and (d); Fed. R. Bank. P. 3018. Once exclusivity terminates, any party in interest may propose a plan. Section 1121(c). As such, regardless of how Cloud Cap acquired its interest, the Code allows it as a party in interest to propose a plan.

That said, it appears that Debtor is arguing that when it was in negotiations with Cloud Cap, Debtor would not have had those discussions if the Debtor knew that Cloud Cap would secretly purchase a claim to propose a competing plan. As such, the Debtor posits that such conduct was bad faith.

Clearly, section 1126(e) does not apply to Cloud Cap filing a competing plan because section 1126(e) only applies to Cloud Cap's vote regarding the Debtor's Plan. As such, the Debtor must rely on section 1129(a)(3) as its basis that Cloud Cap proposing a competing plan violates section 1129(a)(3).

The Eighth Circuit noted that allowing a creditor to propose a liquidating plan after exclusivity has expired is precisely what Congress intended. *See **In re Britton Hook Cattle Co.**,* 747 F.2d 483, 486 (8th Cir. 1984). *Britton Hook Cattle Co.* dealt with the issue of whether a creditor could file a liquidating plan after the exclusivity period had expired. The Eighth Circuit found the Fifth Circuit's opinion in ***In re Jasik***, 727 F.2d 1379 (5th Cir. 1984) persuasive on this subject. The Eighth Circuit found:

> The *Jasik* court examined the legislative history of section 1121, which gives the chapter 11 debtor the exclusive right to file a reorganization plan within the first 120 days but which allows other parties in interest to file a plan thereafter if the debtor fails to do so. *Id*. at 1381. Congress drafted section 1121 in response to a problem it saw in the earlier law. Under chapter XI of the Bankruptcy Act of 1898, only the debtor could propose a business reorganization plan. This arrangement gave the debtor "undue bargaining leverage, because by delay he *** [could] force a settlement out of otherwise unwilling creditors." *Id*. (quoting H.R.Rep. No. 595, 95th Cong. & Ad.News 5787, 5963, 6191). As Congress explained, by granting creditors authority to propose a plan if the debtor has failed to do so within the first 120 days, section 1121(c) "serves to eliminate the potential harm and disadvantages to creditors and democratizes the reorganization process." *Id*. at 1382 (quoting *Bankruptcy Act Revision*, Serial No. 27, Part 3, *Hearings on H.R. 31 and H.R. 32 before the Subcomm. on Civil and Constitutional Rights of the Comm. on the Judiciary*, 94th Cong., 2d Sess. (1976)).

***Britton Hook Cattle***, 747 F.2d at 485-86.

As such, proposing a plan after exclusivity has expired is not bad faith under section 1129(a)(3).

As to how this Court should evaluate Cloud Cap's Plan under section 1129(a)(3), this Court has explained that:

The Fifth Circuit Court of Appeals has held that "[w]here the plan is proposed with the legitimate and honest purpose to reorganize and has a reasonable hope of success, the good faith requirement of section 1129(a)(3) is satisfied." *In re Sun Country Dev., Inc.*, 764 F.2d 406, 408 (5th Cir. 1985). "The requirement of good faith must be viewed in light of the totality of the circumstances surrounding establishment of a Chapter 11 plan, keeping in mind the purpose of the Bankruptcy Code is to give debtors a reasonable opportunity to make a fresh start." *In re T-H New Orleans Ltd. P'ship*, 116 F.3d 790, 802 (5th Cir. 1997), *citing Sun Country*, 764 F.2d at 408. Moreover, "[a] plan may not be the one that the creditors would themselves design and may indeed not be confirmed and yet still pass the good faith requirement." *Briscoe Enter.*, 994 F.2d at 1167.

*SOS*, 388 B.R. at 247.

Cloud Cap's Plan as proposed is feasible. Further, for the most part, it mirrors the Debtor's Plan but for payments to Sayers and the Debtor's bankruptcy counsel. Unsecured creditors get 22% of their allowed claims paid in short proximity of confirmation. The Cloud Cap Plan does not give the Debtor a fresh start. Nevertheless, it does comply with applicable law but for the issue of an impaired accepting class and payment of Debtor's counsel fees. The fact that Cloud Cap acquired a claim and then proposed a plan is not *per se* bad faith. First, as noted in *Jasik*, Congress intended for creditors to file competing plans after exclusivity expired. Second, had the Debtor proposed a confirmable plan, then under section 1129(c), the Court would have acceded to creditors' preferences and confirmed the Debtor's Plan. Having failed to retain the exclusive right to propose a plan and present a confirmable plan, the Debtor cannot assert that Cloud Cap's Plan fails under section 1129(a)(3) other than to pay Debtor's administrative expense for counsel.[11]

---

[11] *Cf. **In re Universe Corp.***, 72 B.R. 95 (Bankr. N.D. Ill. 1987). In *Universe*, the court concluded that a former president of the debtor could not propose a competing plan against the debtor where it was determined that the president's inequitable conduct forced the debtor into bankruptcy. Now as a competitor of the debtor, the former president had proposed a competing plan to force the liquidation of the debtor and wipe out a judgment against him. Those are not the facts of this case. Cloud Cap was created to acquire the Debtor and has no liability against the Debtor.

(2)    <u>Are Jeff Sayers' Claims Equity or in the Form of Loans to the Debtor</u>?

As noted, Cloud Cap does not have an impaired accepting class under Section 1129(a)(10).  Sayers filed three proofs of claim in the Debtor's case:  (a) Proof of Claim No. 25 in the amount of $89,123.74 representing personal loans to the Debtor; (b) Proof of Claim No. 26 in the amount of $16,268.82 for unpaid wages and health benefits; and (c) Proof of Claim No. 27 in the amount of $814,235.75 for personal guarantees.  (*See* Cloud Cap's Ex. 9.)  Sayers' vote regarding Cloud Cap's Class 8 is the only vote implicated in the analysis.

Jeff Sayers cast his claim for unpaid wages and health care benefits in Class 2 in favor of the Debtor.  Sayers also cast his claim for $89,123.74 for loans to the Debtor as a Class 8 vote in favor of the Debtor and rejecting Cloud Cap's Plan.  Sayers also voted his $814,235.75 claim as rejecting Cloud Cap's Class 9 – the contingent reimbursement class and in favor of Debtor's Plan – Class 10 as an insider of the Debtor.

Cloud Cap argues that if Jeff Sayers' Class 8 claim is deemed not to be a loan, but as an equity contribution, then his vote would not count in Class 8 and there would be sufficient amount of debt and numbers of votes for Cloud Cap to have an impaired accepting class.

Upon solicitation, the votes of unsecured creditors in Class 8 in both plans failed to "accept" either plan.  However, when eliminating the claim of Sayers from the tally (or both Sayers and Negro), the unsecured creditors voted to accept Cloud Cap's Plan.  The tally is as follows:

| **TOTAL YES VOTES** | **$339,443.39** | **16** |
|---|---|---|
| **TOTAL NO VOTES** | **$142,462.42** | **13** |
| Percent Accepting | 70% | 55% |

By eliminating the votes of Sayers, the creditors supported the confirmation of Cloud Cap's Plan.

Sayers filed Claim No. 25 as a debt claim for personal loans to the Debtor in the amount of $89,123.74. Cloud Cap argues that Claim No. 25 should be recharacterized as an equity claim pursuant to 11 U.S.C. § 502. When a creditor files a timely claim, the Bankruptcy Code states that "the court, after notice and hearing, shall determine the amount of such claim . . . and shall allow such claim in such amount, except to the extent that (i) such claim is unenforceable under applicable law. . . ." 11 U.S.C. § 502(b). The Court held a hearing and ruled that it would temporarily allow Sayers' claims but reserve the issue of whether the claims could be recharacterized at confirmation.

Cloud Cap argues that the Proof of Claim filed by Sayers meets most of the criteria identified by the Fifth Circuit in its recent opinion on recharacterization. In *Lothian Oil Inc.*, 650 F.3d 359, the Fifth Circuit upheld Judge King's recharacterization of Grossman's claim as being equity on the basis that bankruptcy courts could recharacterize debt based on state law principles. The Circuit Court cited to *Arch Petroleum v. Sharp*, 958 S.W. 2d 475, 477 n.3 (Tex. App. 1997), which in turn cited *Fin Hay Realty Co v. United States*, 398 F.2d 694 (3d Cir. 1968), as the Texas standard for recharacterization of debt as equity:

> (1) the intent of the parties; (2) the identity between creditors and shareholders; (3) the extent of participation in management by the holder of the instrument; (4) the ability of the corporation to obtain funds from outside sources; (5) the 'thinness' of the capital structure in relation to debt; (6) the risk involved; (7) the formal indicia of the arrangement; (8) the relative position of the obliges as to other creditors regarding the payment of interest and principal; (9) the voting power of the holder of the instrument; (10) the provision of a fixed rate of interest; (11) a contingency on the obligation to repay; (12) the source of the interest payments; (13) the presence or absence of a fixed maturity date; (14) a provision for redemption by the corporation; (15) a provision for redemption at the option of the holder; and (16) the timing of the advance with reference to the organization of the corporation.

*Fin Hay Realty Co.*, 398 F.2d at 696. Cloud Cap argues that claim 25 meets most of these criteria. The sole documentation of Sayers' claim consists of book entries on the Debtor's QuickBooks system. There is no note; Sayers is the Debtor's insider; the Debtor was thinly

capitalized; there was substantial risk of repayment; there are no formal documents, no interest rate, and no fixed maturity date. Cloud Cap argues that Sayers' claim should be treated by this Court the same way it was treated by the Debtor – as equity that would be repaid only after other creditors were paid.

Sayers filed Claim No. 26 as a priority wage claim pursuant to 11 U.S.C. § 507(a)(4) and (a)(5) in the amount of $16,268.82. The documentation for this claim consists solely of the Debtor's QuickBooks entries and is wholly insufficient to show that payments were made or that Sayers earned but was not paid wages during the 180 days prepetition. Nonetheless, the allowed priority for wage claims is limited to $11,725, not the $13,002 claimed by Sayers. The balance of this claim, as allowed, should be included in a general unsecured claim.

The Debtor argues in response that Sayers, being an insider, is not the equivalent of an equity holder. Further, the Debtor asserts that Sayers has sufficiently documented his transactions with the Debtor to demonstrate that he loaned money to the Debtor. The Debtor further asserts that Sayers, although an insider, is not an equity holder because there is no capital account evidencing equity.

The Debtor argues that the *Lothian* decision is not only incorrect, but does apply to the case at bar. The Debtor argues that *Lothian* is inapplicable because in *Lothian* the owner got a royalty interest in well production. *See Lothian*, 650 F.2d at 541. The Debtor suggests that the Fifth Circuit did not follow state law in deciding whether to recharacterize debt as equity. *See id.* at 542-43.

Sayers' arguments regarding the existence of his loans to the Debtor are unavailing. The Court agrees with Cloud Cap that in applying the test in *Lothian*, Sayers has not demonstrated that he had made loans to the Debtor. There is no note; no terms are defined; and there is no maturity date. The only proof of the existence of a loan is a March 10, 2011 balance sheet, and

transaction by account ledger dated February 25, 2011.  Sayers could add little more to the basis for the loans to the Debtor other than that he took out a home equity loan to loan money to the Debtor and that he gave money to the Debtor over time.  He also indicated that he purchased products for the Debtor with his personal credit cards.  Sayers also testified that he took out a line of credit in the amount of $23,000 that he is unable to repay.  Sayers further stated that he has made capital contributions to the Debtor in cash in years past.  He could not explain the difference between capital contributions in the past and the recent loans he made to Mangia.

Michelle Musick testified that there were no capital accounts and only notes payable to Jeff Sayers and Mark Negro.  She prepared the QuickBooks entries for Sayers' proofs of claim. She stated she never verified that a note existed for Sayers' and Negro's loans to the Debtor.

The Court agrees with Cloud Cap that Sayers' loans in the amount of $89,123.74 are not really loans, but equity in the form of capital contributions.  The record  does not present any evidence of what are generally considered loan terms -- no note, no interest rate, no maturity date, or even when the loans were made.  Sayers is an insider and the record presented shows a Debtor with limited capital.  Moreover, Sayers' testimony demonstrated that he had little expectation that the loans would be repaid.  Accordingly, the Court will classify Sayers' Class 8 vote as equity in Class 9.  Based on this adjustment, Cloud Cap now has an impaired accepting class.

## CONCLUSION

The Court finds that confirmation of the Debtor's Plan should be DENIED because the Plan is  not feasible under section 1129(a)(11) and that it violates the absolute priority rule,  11 U.S.C. § 1129(b)(2)(B)(ii).  The Plan also discriminates against Mark Negro as an equity owner of the Debtor.

The Court also finds that Cloud Cap's Plan should be DENIED, but Cloud Cap may file a non-material modification to the Plan to deal with exculpation, releases, default language, and other mechanical provisions. Further, Cloud Cap must provide for the payment of the Debtor's counsel fees and demonstrate that Cloud Cap has the funds to pay all administrative, secured, and priority claims, and make a distribution to unsecured creditors on a pro rata basis at 22%.

SO ORDERED.

# # #